### ORIENTAL INVESTMENT COMPANY v. MAGGIE BARCLAY ET AL.

Decided March 23, 1901.

**1.—Landlord and Tenant—Privity—Simulated Lease.**

The rule that the servant of a tenant is in privity with the tenant and bound by the terms of the contract between the landlord and tenant applies where there is an actual and bona fide contract of tenancy, but not where such contract is merely a sham lease designed and intended to protect the landlord from liability, and the real relation between the landlord and the ostensible tenant or lessee is that of principal and agent.

**2.—Lease of Hotel as Fraudulent Devise—Corporation as Lessee.**

See evidence held sufficient to show that a lease of a hotel, executed by its owner, a Missouri corporation, to a Texas corporation, was merely a sham and devise to protect the former against liability, the lessee corporation having been organized by and from among stockholders of the former corporation, no part of its capital stock having ever been paid in, and its management of the hotel being in realty that of the owning corporation.

**3.—Master and Servant—Injury to Hotel Employes—Defective Elevator.**

See evidence of negligence and a simulated relation of lessor and lessee under which a corporation that owned a hotel was held liable for injuries to servants therein, ostensibly employed by the lessee corporation,— such injuries resulting from defects in an elevator and its improper operation.

**4.—Same—Estoppel—Corporation.**

The fact that plaintiffs, who were hotel employes, had accepted employment from a corporation which had leased the hotel did not estop them from denying its legal existence and ostensible relation as lessee, where the lessor corporation was in reality still operating the hotel, and the lease was simulated and a mere device to conceal the relation between the lessor and lessee.

**5.—Parol Evidence Varying Written Instrument—Fraud.**

The rule that the terms of a written instrument can not be varied by parol evidence does not apply where it is charged that such instrument is simulated and fraudulent.

**6.—Remarks of Counsel in Objecting to Evidence.**

Defendant having offered in evidence a written lease executed by it to another corporation, counsel for plaintiff, objecting to its introduction, stated in the hearing of the jury that it was a self-serving document prepared for use in this case, and for the purpose of denying the relation of principal and agent between the two corporations. The court admitted the instrument in evidence, and defendants did not request any charge to have the jury disregard the remarks, and nothing in the record shows that the jury were influenced thereby. Held, that the remarks did not constitute reversible error.

**7.—Special Issues—Verdict Held Responsive.**

Where the court submitted to the jury as one of the issues, the question whether a certain corporation was organized in good faith to be a distinct and separate corporation from a named investment company, and was at a given time in good faith running and operating a certain hotel as an independent corporation and bona fide lessee of the investment company, for and in its own behalf and interest, and not for and in behalf of the investment company, and the jury answered that such corporation was not organized in good faith and was not at the time named running the hotel in its own behalf "but was acting as agent for the investment company," such answer was responsive and proper, as the interrogatories submitted the question of agency, and such answer was not, as to the matter of agency, a conclusion of law.

**8.—Same—Findings in Conflict and not Responsive—Correction.**

Where the one issue of negligence on the part of defendant was submitted to the jury by six interrogatories, and they answered four of them in plaintiff's favor and two in defendant's favor, such answers conflicting with each other, such a return of verdict was not responsive to the issues, and it was proper for the court to call the jury's attention thereto and to send them back for further deliberation.

Appeal from Dallas.   Tried below before Hon. W. J. J. Smith.

*Harris, Etheridge & Knight,* for appellant.

*Parks & Crawford, Carden & Carden,* and *Moroney & Love,* for appellees.

BOOKHOUT, ASSOCIATE JUSTICE.—On January 26, 1894, appellees, Maggie Sline, Maggie Barclay, and Alma Semond, sustained injuries by reason of the falling of the freight elevator in use at the Oriental Hotel, in the city of Dallas, and they thereafter instituted their several suits in the District Court of the Fourteenth Judicial District, Dallas

County, against The Oriental, a corporation, organized under and by virtue of the laws of the State of Texas, to recover damages therefor, and thereafter, by amendment, joined as defendant in said suit the appellant, a corporation duly incorporated under and by virtue of the laws of Missouri.

On September 4, 1897, appellees dismissed their suits as to The Oriental, the Texas corporation. On October 12, 1897, appellees severally filed their amended original petition upon which this case was tried. Appellant was made sole defendant by appellees' said amended original petition. On October 12, 1897, appellant filed its amended answer consisting of general and special exceptions, general denial, etc. On October 27, 1897, all three of the cases were, by agreement, consolidated and tried before a jury, on submission of special issues. Appellant's motion for new trial having been overruled, it gave notice of and perfected its appeal. On December 7, 1897, all parties hereto agreed, in writing, that all three of the cases should be submitted on appeal upon one statement of facts, one assignment of errors, one brief, and one transcript.

We take from the brief of appellant the following statement as to the issue and pleadings: "For the purpose of this appeal, it is conceded that the evidence, while conflicting, is sufficient to support the verdict, finding that the appellees sustained injuries through the negligent construction and operation of the freight elevator, as claimed by them, to the amount of their respective recoveries, and the only issues that will be presented on this appeal, save certain errors assigned in respect to the giving and refusal of charges and in the receipt of the verdict, relate to the responsibility of the appellant therefor, it being claimed by the appellant, in substance, that The Oriental was operating said hotel and elevator at the time of the accident under a valid lease from the appellant, which bound the lessee to repair, and that the appellees were all in the employ of said The Oriental at the time of receiving their injuries; and it being claimed in substance by the appellees, on the other hand, that the aforesaid lease was fraudulent and void, and did not express the real relations between The Oriental and appellant, and that in fact the real relation between them was that of principal and agent."

The only portion of the plaintiff's pleading material and necessary to be considered with reference to the issue as to the appellant's responsibility is the second count. This pleading it not sworn to. It sets up the existence of the two corporations, the Oriental Investment Company and The Oriental, and states the purposes for which each was incorporated, and then alleges the lease from the one to the other, and undertakes to avoid the same upon various grounds, which may be thus analyzed and numbered:

1. On January 26, 1894, the Investment Company was the owner of the hotel and of the land upon which it was situated, and on that date and prior thereto, the Investment Company was in possession of and

operating same as a public hotel. That on said date plaintiffs were in the employ of the defendant as chambermaids in said hotel. Then, after setting forth that the elevator of the hotel was out of repair and negligently operated, thereby causing the injuries complained of, said pleading proceeds to aver that on November 29, 1892, the Investment Company bought and took possession of said property for the purpose of running the same as a hotel.

2. That said property was worth $600,000, and the furniture and fixtures were worth $150,000, and that the expense of operating the hotel on January 26, 1894, was about $40,000 per month, and required a capital of $150,000 to operate same.

3. That about November 29, 1892, the Investment Company filed its charter with the Secretary of the State of Missouri, by which it became duly incorporated, as a private corporation, under the name of the Oriental Investment Company, with Wm. F. Nolker, Louis Brinckwirth, Frank Roseman, Hermann A. Haeussler, Elizabeth Schneider, Marquard Forster, Moses Greenwood, Jr., Ferdinand Herold, August Gehner, and Adolphus Busch as incorporators, with a capital stock of $250,000, divided into 2500 shares of $100 each, and that the purpose, as stated in the charter was, 'To purchase, own, and rent buildings erected for pecuniary profit and gain, as provided for in chapter 42, article 8, of the laws of the State of Missouri." That the board of directors named in the charter for the first year were: Marquard Forster, Ferdinand Harold, Adolphus Busch, Hermann A. Haeussler, and Wm. F. Nolker, all of whom were citizens of the State of Missouri.

4. That on the 30th day of September, 1893, a corporation, known as The Oriental, was organized under the laws of the State of Texas, with Walter J. Alden, Adolphus Busch, Louis Reichenstein, Arthur T. Stevens, Louis Brinckwirth, August Gehner, and Hermann A. Haeussler, as incorporators and pretended stockholders, the charter setting forth that Reichenstein, Stevens, and Alden were citizens of Dallas, Texas, and that the purpose of the corporation was, "the establishment and maintenance of a hotel," Reichenstein, Stevens, Alden, Busch, Brinck-wirth, Gehner, and Haeussler being named in the charter as the directors for the first year, and the capital stock of The Oriental being only $10,000, and divided into 100 shares of $100 per share. That as soon as the Investment Company got The Oriental organized, it pretended to put the same in possession of said property under a pretended lease, and that defendant claims that The Oriental was operating said hotel as lessee under said pretended lease on January 26, 1894.

5. That if The Oriental was operating said hotel as lessee, at the date of the injury, still the Investment Company would be liable in that, as a matter of fact, it was agreed between the Investment Company and The Oriental that the former should keep said property in repair, and that the Investment Company, prior to and since January 26, 1894, has made repairs, changes, and alterations to the extent of about $60,000,

paying for the same out of its own funds, and that The Oriental paid no increased rent by reason thereof, and that The Oriental was to act as the agent of the Investment Company against liability in the matter of running the hotel, and that Reichenstein, Alden, and Stevens, at the instance of the Oriental Investment Company, subscribed to the charter of The Oriental for the purpose of aiding the Investment Company in the formation of The Oriental for the Investment Company's sole use and benefit, they not having any real interest in The Oriental.

6. That it was agreed, when Reichenstein, Alden, and Stevens subscribed the charter of The Oriental and took stock therein, that they were never to pay for their stock, or to any interest in the corporation, and were neither to make nor lose by reason of being incorporators of The Oriental.

7. That all the stockholders of The Oriental, except Reichenstein, Alden, and Stevens, were also stockholders of the Investment Company; and that they permitted the use of their names for the Investment Company's use and benefit, and have acted solely as dummies and figureheads.

8. That when The Oriental was organized, Stevens, Reichenstein, and Alden were employes of Busch, who was a director and one of the principal stockholders of the Investment Company, and that the Investment Company was desirious of running the hotel and evading responsibility for the liabilities incident thereto, and that for this purpose they organized The Oriental, the Texas corporation, procuring Reichenstein, Alden, and Stevens to become straw incorporators therein.

9. That in pursuance of such understanding, Alden, Reichenstein, and Stevens became dummy stockholders in The Oriental, owning no interest therein.

10. That when The Oriental was organized, it issued all of its $10,000 capital stock to the stockholders of the Investment Company, except three shares which were caused by the Investment Company to be issued to Stevens, Alden, and Reichenstein, and that this was done after the accident to the plaintiffs, and that said last three named stockholders never paid or expected to pay any consideration for the stock issued to them, and that the Investment Company has ever since the organization of The Oriental, owned all of its capital stock, and that The Oriental is only another name for the Investment Company.

11. That Alden has been pretending to act as manager of The Oriental, but in fact was acting as manager of the Investment Company.

12. That Busch, Brinckwirth, Gehner, and Haeussler, subscribers to the charter of The Oriental, then owned a controlling interest in the Investment Company, and that their acts in the matter of organizing The Oriental was for the sole benefit of the Investment Company.

13. That the directors of The Oriental never had, since its organization, a meeting at which either Alden, Stevens, or Reichenstein attended, and that the last named parties never had anything to do with the man-

agement of The Oriental, except that Alden acted as general manager for the Oriental Investment Company.

14. That the Investment Company, since the organization of The Oriental, has superintended and operated said hotel, having the management and control thereof, and that all acts of The Oriental have been those of the Investment Company, and that the pretended possession of The Oriental was in fact that of the Investment Company.

15. That the capital stock of The Oriental is wholly inadequate for the operation and repair of the hotel, as the Investment Company well knew when the lease was made; and that the Investment Company has since September 30, 1893, furnished the provisions and funds necessary to operate said hotel, and has received and appropriated the profits arising from the operation thereof.

16. That no part of the capital stock of The Oriental was ever paid, and no stock issued until after January 26, 1894, The Oriental being without capital and insolvent, and the Investment Company being abundantly solvent.

17. That the time the possession of the hotel was delivered to The Oriental under the lease, the elevator was an existing nuisance upon the premises, and that knowing the same, it deceived The Oriental in representing to it that the elevator was in good repair.

18. That if The Oriental was ever in possession of the hotel, operating under a lease, the same was fraudulent, because not executed until after the plaintiffs had been injured, and fraudulently antedated for the purpose of attempting to shield the Investment Company from liability.

19. That the lease was never intended by the parties thereto to operate as such, and that The Oriental was the mere instrument, agent, and servant of the Investment Company.

20. That the acts of Reichenstein, Alden, and Stevens in assisting in incorporating The Oriental were for the sole purpose of aiding the Investment Company.

The issues submitted to the jury and the answers thereto are as follows:

"1. Did the Oriental Investment Company, the Missouri corporation, cause The Oriental, the Texas corporation, to be organized for the purpose of running and operating the Oriental Hotel in the city of Dallas, for and on behalf of the said Oriental Investment Company, but in the name of said The Oriental; and was said The Oriental so running and operating the said Oriental Hotel for and on behalf of said Oriental Investment Company, but in the name of the said The Oriental, from the time the said Oriental Hotel was opened in October, 1893, up to and including the 26th day of January, 1894, the time when the elevator fell?" Answer: "Yes; it was organized to be run in the interest of Oriental Investment Company, but in the name of The Oriental up to and including the time the elevator fell."

"2. Was The Oriental, the Texas corporation, organized in good faith to be a separate, distinct, and independent corporation from the said Oriental Investment Company, and was said The Oriental, on the 26th day of January, 1894, at the time the elevator fell, in good faith running and operating said Oriental Hotel as an independent corporation and bona fide lessee of said Oriental Investment Company for and on its own behalf, and not for and on behalf of said Oriental Investment Company?" Answer: "No; the Texas corporation was not organized in good faith at the time the elevator fell. The Oriental was not running in its own behalf but was acting as agent for the Oriental Investment Company."

"If you find in the negative on the issue submitted in paragraph number 1, above, or if you find in the affirmative on the issues in paragraph number 2, above. then you will go no further, but in each of said three causes, after writing your findings upon said issues above submitted, return the following verdict: 'We the jury find for defendant, Oriental Investment Company.'

"But if you find in the affirmative on the issues submitted in paragraph number 1, above, and in the negative on the issues submitted in paragraph number 2, above, then the following additional issues are submitted to you for your determination from the evidence before you:

"3. Was the elevator in the Oriental Hotel, which fell on the 26th day of January, 1894, at the time it so fell, defective or out of repair in the particulars or any of them alleged by plaintiffs in their petition?" Answer: "Yes."

"4. If you answer that said elevator was so defective or out of repair, were such defects, if any, or want of repair, if any, known to the servants, if any, of The Oriental, or of the Oriental Investment Company having said elevator in their charge or control?" Answer: "No."

"5. Could the Oriental Investment Company or The Oriental, by the use of ordinary care and diligence prior to the time said elevator fell, have discovered such defects, if any, or said want of repair, if any? By 'ordinary care and diligence' is meant such care and diligence as a person of ordinary care and diligence would exercise under like circumstances." Answer: "Yes."

"6. Was the fall of said elevator on the 26th day of January, 1894, proximately caused by any defects, if any, or want of repair, if any, then existing in said elevator?" Answer: "It was."

"7. Did the fall of said elevator proximately result from the failure, if any, of Oriental Investment Company or of The Oriental to use ordinary care and diligence, as hereinbefore defined, to discover and remedy such defects, if any, or want of repair, if any, existing in said elevator?" Answer: "Yes."

"8. Were all the plaintiffs, at the time said elevator so fell, upon the same with a quantity of hotel linen, carrying the same from the linen room of said hotel to their respective rooms on another floor of the hotel in the regular discharge of their duties as chambermaids of said hotel?"

Answer: "Yes; they were carrying linen in the discharge of their duties."

"9. Did the rules of said hotel prohibit plaintiffs, when carrying hotel linens from floor to floor, from riding on said elevator at the time it so fell, and were said rules known to the plaintiffs and each of them, and if not so known could such rules, if any, have been known by plaintiffs by the use of ordinary care and diligence on their part, as hereinbefore defined?" Answer: "No, we think not; they were acting under directions of housekeeper."

"10. Was W. J. Alden managing officer in charge of said hotel on the 26th day of January, 1894, at the time the elevator so fell, and prior thereto?" Answer: "He was."

"11. Did W. J. Alden authorize and direct any of the plaintiffs to ride upon said elevator when carrying hotel linens from floor to floor of said hotel in discharge of their duties as chambermaids in said hotel, and if any of the plaintiffs, which of them?" Answer: "No, he did not direct either of them."

"12. Did the housekeeper of said hotel, on the 26th day of January, 1894, and prior thereto, have charge and control of plaintiffs as chambermaids in said hotel, and did she have power and authority to employ and discharge them as chambermaids, and to command, direct, and control them in the performance of their duties as chambermaids?" Answer: "She did."

"13. Did such housekeeper direct any of the plaintiffs, and, if any, which of the plaintiffs, to ride upon said elevator when carrying hotel linens from floor to floor of said hotel in the discharge of their duties as chambermaids in said hotel?" Answer: "Yes; Maggie Sline, Maggie Barclay, and Alma Semond."

"14. Were said plaintiffs upon said elevator at the time it so fell on the 26th day of January, 1894, each with hotel linens in obedience to the directions given to them at the time by the housekeeper of said hotel, and did such housekeeper have authority to direct them so to use said elevator?" Answer: "Yes; they were upon said elevator at the time it fell, on the 26th day of January, 1894, each with hotel linens in obedience to directions given by housekeeper. She had authority over the elevator in her department."

"15. If you find that said elevator was defective or out of repair when it so fell on the 26th day of January, 1894, then did any of the plaintiffs, and, if any of them, which one or ones, know of such defects, if any, or want of repair, if any, or could plaintiffs, or either of them, and if either of them, which one or ones, have known by the use of ordinary care and diligence, as hereinbefore defined, of such defects, if any, or want of repairs, if any, in said elevator?" Answer: "No, they could not have known it."

"16. Was Charlie Vignes, the operator of said elevator, at the time it fell on January 26, 1894, a reasonably competent and careful person for that employment, and was he in the exercise of ordinary care and

diligence, as hereinbefore defined?"  Answer:  "We find that Charlie Vignes, at the time that the elevator fell, was not a competent person for that employment; and while the accident was not caused directly by his negligence, yet he did not exercise the ordinary care and diligence that a competent and skillful person would have done."

"17.  If you answer that Charlie Vignes was not a reasonably competent and careful person to operate said elevator, then was this known to The Oriental, or the Oriental Investment Company, or could it have been to them, or either of them, 'by the use of ordinary care and diligence as hereinbefore defined?"  Answer:  "They could have known it through their agent W. J. Alden."

"18.  Did the Oriental Investment Company or The Oriental use ordinary care and diligence, as hereinbefore defined, to secure a reasonably competent and careful elevator operator in the selection and employment of Charlie Vignes as such elevator operator?"  Answer:  "No, they did not."

"19.  If you find that Charlie Vignes was not a reasonably competent and careful elevator operator, then did plaintiffs, or either of them, (and if either of them, which one or ones), know, or could they have known by the exercise of ordinary care and diligence, as hereinbefore defined, that he was not a reasonably competent and careful operator of said elevator?"  Answer:  "No, they could not have known."

"20.  Did the fall of said elevator result from the failure, if any, of Charlie Vignes to use ordinary care and diligence, as hereinbefore defined, in the operation of said elevator, at the time or just before it fell on the 26th day of January, 1894?"  Answer:  "See our answer to paragraph 16."

"21.  Did plaintiff, Maggie Sline, receive the injuries, or any of them, complained of in her petition at the time said elevator fell on the 26th day of January, 1894, and were such injuries, if any, proximately caused and did they proximately result from the failure, if any, of the Oriental Investment Company or The Oriental to use ordinary care and diligence, as hereinbefore defined, to discover the defects, if any, or want of repair, if any, in said elevator?"  Answer:  "Yes; she received her injuries when the elevator fell, and they did proximately result by the failure of Oriental Investment Company, through its agent, W. J. Alden, to use ordinary care to discover the defects in machinery, and employ proper person to operate elevator."

"22.  Is it reasonably certain that the injuries, or any of them, of Maggie Sline, so received, if any, are permanent?"  Answer:  "Yes."

"23.  What amount would, in your judgment, be a fair compensation to Maggie Sline for the injuries and damages, if any, sutained by her in the fall of said elevator, and complained of in her petition, taking into estimation the physical pain and mental suffering of Maggie Sline, her impaired capacity, if any, to earn a living, and the permanency of her injuries, if it is reasonably certain that they are permanent, and her

reasonable doctor bills incurred by said injuries?" Answer: "Six thousand dollars."

[Like issues to those contained in Nos. 21, 22, and 23 were submitted with reference to plaintiffs Maggie Barclay and Alma Semond, and were ansered by the jury in like manner.]

"30. Did the Union Casualty Company, of St. Louis, on or about the 15th day of September, 1897, for The Oriental, pay to the plaintiffs, or any of them, and, if any of them, which one or ones, any sum of money, and, if any, how much, in satisfaction of their or any of their claims or suits against The Oriental for damages for the aleged injuries here sued for? And if so, did such plaintiff or plaintiffs, if any of them, receive the same in complete satisfaction or partial satisfaction of either?" Answer: "They received nothing."

"31. Was there any contract, agreement, or understanding between plaintiffs, or any one of them (and, if any, specify one or ones), and Parks and Bradford, that they or either of the plaintiffs are to receive any part of the $4500 paid to Parks & Bradford?" Answer: "There was no such an agreement."

"32. You are the exclusive judges of the credibility of the witnesses and the weight of the evidence."

Issues submitted upon the request of the defendant:

"1. Did The Oriental, the Texas corporation, go into the possession of the hotel under the lease from the Oriental Investment Company and conduct the business of running a hotel for its own account?" Answer: "We did not so find."

"2. Did the party operating the hotel in the selection of the elevator and machinery and in keeping of the same in repair, employ the care that would be exercised by a person of ordinary care and prudence?" Answer: "We are of the opinion that they did not."

"3. Was the payment of the money to Parks & Bradford by the Union Casualty Company for the account of The Oriental made for the benefit of the plaintiffs?" Answer: "The plaintiffs did not receive any money."

"Was the subscription of the capital stock of The Oriental made and signed on October 10, 1893, as shown by record read in evidence?" Answer: "Yes, it was shown in evidence."

"And was lease read in evidence made, executed, and delivered before November 1, 1893?" Answer: "Yes, it was."

"And was the contract between Oriental and W. J. Alden read in evidence made, executed, and delivered before November 1, 1893?" Answer: "Yes, it was."

"And were all the books and papers of the Oriental Investment Company at Dallas, Texas, sent to the home office at St. Louis before January 1, 1894, and a full settlement of all matters between Alden and Oriental on one part and the Oriental Investment Company on the other had before January 1, 1894?" Answer: "Yes, it was as shown by the evidence."

When the findings were returned into court, the following additional instruction was given:

"Gentlemen of the Jury: Your attention is called to the fact that there is a conflict between your answers to the issues submitted in paragraph number 2 of the issues submitted at the request of defendant, on the one hand, and your answers to the issues submitted in paragraphs numbered 5 and 6, first submitted by the court, on the other hand.

"And also that there is a conflict between your answers to the issues submitted in paragraph number 7, on the one hand, and your answers to the issues submitted in paragraphs numbered 5 and 6 on the other hand."

Whereupon the jury again retired and returned into court their findings so changed as to make their answer "Yes" to the seventh issue submitted by the court in the general charge, whereas their previous answer thereto had been "No;" and their answer to the second issue submitted by the court, at the instance of appellant, was made to read: "We are of opinion that they did not," whereas, the previous answer of the jury thereto, was: "We are of the opinion that they did." We adopt as our conclusions of fact the findings of the jury and the additional facts set out in the opinion.

1. The first assignment of error presented by appellant reads: "The court erred in overruling defendant's ninth special exception, excepting to all that part of said count of said petition which alleged that while the lease from the defendant to The Oriental purported to bind said Oriental to keep said hotel in repair, yet as a matter of fact it was understood between said Oriental and defendant that the latter should keep said hotel in repair, because that said petition shows that said lease contract was in writing, and it is not alleged that said understanding so sought to be set up by the plaintiffs was omitted from said lease by the mistake, fraud, accident, or the deceit of either party thereto. The overruling of said exception was error because the plaintiffs, having voluntarily accepted employment from The Oriental, were in no position to question the ostensible relations existing between The Oriental and the Oriental Investment Company."

The petition charged, in effect, that the hotel was being operated by the Orinetal Investment Company at the time of the accident; while the defendant investment company claims that it was being operated at that time by The Oriental under a lease from the Investment Company, which lease bound The Oriental to keep the premises in repair, and for that reason the Investment Company was not liable. In reply to this defense the plaintiffs alleged that if there was such a lease, it was simulated and a mere sham, designed and intended to protect appellant from liability, and in truth and in fact it was the understanding that appellant was to keep the property in repair. It is charged by the plaintiffs that it was operated by The Oriental as the agent of appellant, and the lease was but a device designed and intended to conceal the true relation of

appellant, that of principal, in the operation of said hotel. If these allegations are true, the appellant could not shield itself from liability by setting up the lease. The relation which the parties sustained under the allegations made by plaintiffs was that of principal and agent, and not lessor and lessee. The rule invoked by the appellant, that the servant of a tenant is in privity with the tenant and bound by the terms of the contract between the landlord and tenant, is conceded to be sound where there is an actual and bona fide contract between the parties. Such was the case of the East Line Railroad Company v. Culberson, 72 Texas, 375. But this rule can not apply here, if, as alleged, the lease was a sham intended to conceal the true relation between the parties.

It is further contended under said assignment that, the lease being in writing, its terms can not be varied by parol evidence. This rule can not be invoked to prevent an attack upon a written instrument where it is charged that such instrument is simulated and fraudulent. The pleadings of plaintiffs further alleged as a fact that the appellant did make repairs on the premises during the term covered by the lease. The court did not err in overruling the exception to the petition. In support of the principles above announced, see Robinson v. State, 24 Texas, 152; Railway v. Warner, 32 S. W. Rep., 868; Smith v. Smith, 81 Texas, 45; Labadie v. Hawley, 61 Texas, 169; Davis v. Bingham, 46 S. W. Rep., 840; Johnson v. L. C. L. Co., 29 Pac. Rep., 451; Burkeson v. Railway, 45 S. W. Rep., 1119; Poor v. Sears, 28 N. E. Rep., 1046.

These remarks also dispose of the ninth and tenth and twenty-second assignments of error adversely to appellant.

2. Appellant's seventeenth and thirteenth assignments are grouped, and under these appellant presents twenty-eight propositions, some of which announce correct propositions of law, but which are not applicable to the case as made. It is contended that the court erred in refusing a peremptory instruction to the jury to return a verdict for defendant because there was no evidence before them tending to show that The Oriental, the Texas corporation, was the agent of the St. Louis corporation, the Oriental Investment Company. In 1890 the Oriental Hotel Company, a Texas corporation, built and erected what is known as the Oriental Hotel, in the city of Dallas. This company executed to the St. Louis Trust Company a trust deed on the property to secure its bonds to the amount of $250,000. The deed of trust was foreclosed, and the property was bought in by Herman A. Haeussler, of St. Louis, for the bondholders. In March, 1892, the Oriental Investment Company was incorporated under the laws of Missouri with an authorized capital of $250,000, and with authority "to purchase, own, and rent buildings erected for pecuniary profit and gain." The late bondholders subscribed for this stock in proportion to their respective interests. In November, 1892, the hotel was conveyed by Haeussler to the Investment Company for the consideration of $125,000, which was credited on the stock subscriptions, the remaining 50 per cent being subject to call. About June, 1893, the Investment Company em-

ployed W. J. Alden, an experienced hotel man, to assist in furnishing the house, the expense to be paid by the Investment Company by calls on the unpaid capital stock.

At a meeting of the board of directors of the Investment Company, held on September 22, 1893, it was determined to organize a new company under the laws of Texas to operate the hotel, with Mr. Allen as manager and secretary, and that each stockholder take stock not to exceed 5 per cent of his stock in the Invertment Company. A new company was organized under the laws of Texas with a capital stock of $10,-000. As all the stockholders of the Investment Company were citizens of Missouri, and as the laws of Texas required that a Texas corporation should have resident stockholders, Alden, the manager, and Stevens and Reichenstein, Dallas employes of the Anheuser-Busch Brewing Association, of St. Louis, were selected as the Texas stockholders. Adolphus Busch was president of said brewing association, and director· and one of the principal stockholders in said Investment Company. Alden, Stevens, and Reichenstein each subscribed for one share of stock, but they never paid anything on their subscriptions. A charter was prepared for The Oriental and filed with the Secretary of State on October 4, 1893.

A number of the stockholders had not agreed to the proposed arrangement. Haeussler, nevertheless, signed their names to the subscription of the stock of The Oriental, intending to afterwards secure their ratification, which was done, but when does not clearly appear. Only 20 per cent of the capital stock, amounting to $2000, was paid on the stock of The Oriental, and this was paid by the secretary and treasurer of the Investment Company by check for that amount drawn by him on the funds of the Investment Company. Alden, Stevens, and Reichenstein paid nothing on their stock, but the 20 per cent was deducted from the pro rata subscription of Busch made in his own name. A contract was executed between W. J. Alden and The Oriental, dated October 10, 1893, by which he was made its manager at a salary of $3000 per annum and 10 per cent of the net earnings. The lease from the Investment Company to The Oriental bears date October 10, 1893, and is signed by Marquard Forster, president, and H. A. Haeussler, secretary of the Investment Company, and Adolphus Busch, president, L. Reichenstein, vice-president, and W. J. Alden, secretary and manages of The Oriental. The lease was for two years and eight months from October 1, 1893, the lessee to pay rent at $1500 a month, payable monthly, and keep the property in repair, and pay all taxes and insurance on the property. The lease does not apppear to have been fully signed or delivered until about October 14, 1893, and was first reported to the board of directors of the Investment Company on December 16, 1893. The hotel was furnished and equipped, and on October 9, 1893, was opened for business by the Investment Company, and it continued in possession and control of the property, with W. J. Alden as manager, up to the time the lease to The Oriental was fully executed and delivered. The lease to The Oriental was never recorded. There was no visible change of management or con-

·trol. Alden, who had been manager for the Investment Company, remained as manager of The Oriental. No changes were made in the employes, except such as occurred from time to time in the ordinary course of business. No employes, other than Alden and Mrs. Hazen, the housekeeper, appear to have been notified of any change of possession or management. Alden retained the books of the Investment Company and continud to represent it. at least to whatever extent was necessary, until some time in January, 1894. The Investment Company does not appear to have had any other representatives in Dallas. The hotel was the only property the Investment Company owned. It is undisputed that plaintiff Maggie Sline was employed on September 23, 1893, and that plaintiff Maggie Barclay was employed on October 9, 1893. They were then employed at $15 per month, which agreement was never changed, and the only contract of employment they ever had was with appellant, the Investment Company. They never heard of The Oriental, or the lease, until after the accident. Plaintiff Alma Semond was employed October 24, 1893, after the execution of the alleged lease, but with no knowledge of its existence. A large number of employes, including all of the plaintiffs, who worked in the hotel after October 10, 1893, and before and after the accident, testified in substance that they were employed and worked for the Oriental Investment Company, the St. Louis Company, the company that owned the property, etc.

There is evidence tending to show that it required experience to run the elevator; that Vignes, the elevator operator, was wholly inexperienced; that he did the best he knew, but, on account of his incompetency he did not operate the elevator properly, and this was one of the proximate causes of the accident. The evidence also tends to show that his incompetency ought to have been known by appellant or Alden before the accident occurred. The evidence also tends to show that the elevator itself was in a dangerous condition, which ought to have been known by appellant, or Alden, before the accident, and this was one of the concurring proximate causes of the accident.

The Oriental never had a dollar of paid up capital except what the Investment Company furnished out of its own treasury, nor did it have a dollar or a cent of any kind when it claimed it began to operate the hotel, October 10, 1893. Not a single subscriber to its stock had paid a cent. Where the money came from to pay for its charter, which was filed on October 4, 1893, does not appear. On October 14, 1893, the Investment Company sent from St. Louis $2000 to The Oriental. This was to pay 20 per cent of the stock subscription. It was the Investment Company's money. On April 26, 1894, there was a meeting at Dallas of the directors of The Oriental, and the proceedings were had that made the entire capital paid up, as one witness puts it. These "proceedings" consisted of a mere statement that The Oriental had made $8000 in profits, in the face of the fact that it had not up to that time paid its rent with regularity or when due. A new corporation, the Oriental Hotel Association, was formed in March, 1896, under the laws of Texas, with an

authorized capital of $150,000. The Investment Company had The Oriental join in conveying to the Oriental Hotel Association all their assets, real and personal, including said hotel and its appurtenances. The hotel association assumed the $10,000 liabilities of The Oriental to the Investment Company, and in payment issued to the Investment Company $10,000 in stock of the hotel association. The hotel association issued to the Investment Company $300,000 in first mortgage bonds, which are now held by the Investment Company, except a portion which it has hypothecated to secure money borrowed to pay off mechanics' liens which had been established against the property. The consideration of the entire transfer from both companies was stated at $450,000, consisting of $150,000 in stock and $300,000 bonds, and $140,000 of the stock was issued direct to the Investment Company, the remaining $10,000 being also issued to the Investment Company in payment of the $10,000 debt of The Oriental which the hotel association had assumed.

While the business was ostensibly in the exclusive charge of The Oriental, its directors do not appear to have met but four times during its entire existence. Hermann A. Hauessler was secretary and treasurer of the Investment Company, and when the accident occurred, Alden reported the same to him and asked for instructions. The Investment Company paid Hauessler for his services in organizing The Oriental. After the lease had been made to The Oriental, accounts were run without change of style with prominent Dallas merchants who do not appear to have been advised of any change. After the alleged lease on November 29, 1894, the Investment Company contributed $2500 to purchase a new boiler for the hotel. There is also evidence tending to show that the Investment Company furnished some supplies. While The Oriental ostensibly had complete possession and management, and was entitled to all the revenues, yet the Anheuser-Busch Brewing Association paid the Investment Company $2000 to have its beer sold at the hotel, and The Oriental got none of this money. The Investment Company insisted that Stevens should countersign all checks drawn by Alden as manager of The Oriental, because the Investment Company lacked confidence in The Oriental's manager. It is undisputed that The Oriental, the Oriental Investment Company and the Oriental Hotel Association had the same stockholders, and that their holdings were exactly in the same proportions in all three companies, except that Alden, Reichenstein, and Stevens each held one share in The Oriental, which was deducted from the holdings of Busch.

It is conceded by appellant that the evidence is sufficient to support the verdict finding that the appellees sustained injuries through the negligent construction and operation of the freight elevator as claimed by them, and that they each sustained damages in the amount of their respective recoveries.

If the relation between the Investment Company and the operating company, The Oriental, was a mere cloak to cover up fraud, then there can be no doubt but the court is authorized to ignore the apparent rela-

tion between the parties in order to circumvent the fraud. Cook on Corp., secs. 6, 663. And in the absence of fraud, it has been held that where a railroad company causes a telegraph company to be incorporated, and subscribes to all of its stock and appoints all its officers and holds it out as the future owner of a telegraph system which the railroad owns, and then sells that system to some one else, a person contracting with the telegraph company on the faith of the scheme being carried out, may hold the railroad company liable on the contract, on the principle of the principal being liable on the contracts of its agent. Telegraph Co. v. Telegraph Co., 51 Fed. Rep., 49; Telegraph Co. v. Telegraph Co., 54 Fed. Rep., 50.

Again, it is held that where the corporation does business by organizing branch corporations, and the stockholders in the latter are disregarded, and the main corporation pays up the stock and manages without regard to its corporate character, the property of the branch corporation is subject to the debt of the parent company. Day v. Telegraph Co., 66 Md., 354, 7 Atl. Rep., 611. If a company leases all of its property to another, the stockholders in both being the same, a mechanic's lien good against the latter company is also good as against the company owning the property. Hatcher v. United L. Co., 75 Fed. Rep., 368.

So, where a construction company under contract with a railroad company takes all the stock and bonds and does all the work until the road is finished, a creditor of such construction company may file a lien under the statute and enforce it the same as though he furnished the labor and material to the railroad company itself. McDonald v. Railway, 93 Tenn., 281, 24 S. W. Rep., 252.

The case of Lehigh Mining and Manufacturing Company v. Kelly, 160 United States, 337, was a case in which a Virginia corporation owned certain lands in the State of Virginia for which it wished to bring suit in the United States court, and for that purpose its stockholders organized a new corporation under the laws of Pennsylvania called the Lehigh Mining and Manufacturing Company, to which the Virginia company conveyed its property, and suit was brought in the name of that company. A question arose whether the organization of the latter company for the purpose of bringing suit in the Federal court should be maintained. The Supreme Court of the United States, in passing upon the question, said that "the officers and members of the Virginia corporation had assumed as a body the mask of a Pennsylvania corporation for the purpose, and the purpose only, of invoking the jurisdiction of the Circuit Court of the United States, retaining the power, in their discretion, and after all danger of defeating the jurisdiction of the Federal court shall have passed, to throw off that mask and reappear under the original form of a Virginia corporation; their right, in the meantime to participate in the management of the general affairs of the latter corporation not having been impaired by the conveyance to the Pennsylvania corporation." It was held that the proceedings were ineffectual to confer jurisdiction on the Federal court

In this case the facts show that the Investment Company, as evidenced by the minutes of that company, as a company, determined to organize an operating company in which each of its stockholders was to take stock to the extent of 5 per cent of his holdings in the Investment Company; that such corporation was formed with practically the same stockholders, and that their holdings therein were in exact proportion to their holdings in the Investment Company; that the directors and officers of such company were elected by the Investment Company; that the only cash paid on the capital stock of the operating company was $2000 paid by the Investment Company; that Alden who had acted as manager of the hotel for the Investment Company was made the manager of the operating company; that the formation of the new company and the execution of this lease was not generally known; that the Investment Company did make certain repairs on the hotel during the term for which it was leased; that money contributed for the sale of a certain manufacture of beer in consideration of its use in the hotel bar went to the Investment Company and not the operating company; that the secretary and attorney of the Investment Company procured the charter for and organized the operating company, for which he was paid a fee by the Investment Company; that reports seem to have been regularly made by the manager to the Investment Company; and that the report of the accident which caused injury to plaintiffs was promptly sent to the secretary of the Investment Company and his advice requested; that the authorized capital of the operating company was only $10,000, and the entire property of the Investment Company, amounting to over $250,-000, was turned over to said company, for which it agreed to pay a monthly rental of $1500 for two years and eight months, without security being demanded or given; and that before the expiration of the lease of The Oriental, the stockholders of the Investment Company formed a new corporation, known as the Oriental Hotel Association, to which company it caused all the property of the Investment Company and The Oriental to be conveyed. These facts tend strongly to show that The Oriental was merely the tool of the Investment Company, and in operating the hotel it was acting as the agent of that company. Railway v. Sellers, 17 Atl. Rep., 987; Railway v. Horan, 41 Am. and Eng. R. R. Cas., 13; Montgomery v. Forbes, 148 Mass., 252; Berkson v. Railway, 45 S. W. Rep., 1119. See also authorities cited in the discussion of first assignment.

The evidence was sufficient to raise this issue, and the court was justified in submitting the same to the jury. There was no error in refusing the charge instructing a verdict for defendant.

3. Appellant's fifth assignment of error complains that the trial court erred in this: "When the counsel for appellant offered in evidence the contract, dated October 10, 1893, between The Oriental and its manager, W. J. Alden, in allowing George Carden, attorney for plaintiffs, over the objection of this defendant, to state in the hearing of the jury, 'We object, because it is a self-serving document prepared by the Oriental

Investment Company for use in this case; that it is a self-serving contract, and the Oriental Investment Company and The Oriental were connected in the relation of principal and agent, and our position is that this document was made, and is a self-serving document between the two concerns for the purpose of denying that agency.' " Appellant contends that the plaintiffs did not thereafter offer testimony tending to impeach the date, signature thereto, or bona fides of said contract, and that such language prejudiced defendant's case with the jury, and that the language was calculated to mislead the jury. The objection made to the instrument was overruled by the trial court, and it was read in evidence. Appellants did not request any charge to have the jury disregard the remarks. There is nothing in the record showing that the jury were in any way influenced by the remarks. We are of opinion that the above assignment does not present any reversible error, and the same is overruled. The counsel had the right to state the ground of his objection, and we can not say that there was any abuse of that right in the remarks complained of.

4. Appellant's sixth assignment of error complains that the court erred in the first question propounded by it to the jury, because The Oriental had a legal corporate existence separate and distinct from the Oriental Investment Company, and plaintiffs, having no voluntarily accepted employment under The Oriental, were estopped from questioning either its legal existenc or its ostensible relation to the Oriental Investment Company as the lessee of the latter company. The evidence shows that two of the plaintiffs, to wit, Sline and Barclay, were employed by the manager of the Investment Company prior to the execution of the lease to The Oriental, and that they had no notice of any change in the management of the hotel or of their employment. Alma Semond was employed by the housekeeper, Mrs. Hazen, after the execution of the lease. The defendant did not plead estoppel, except by exception to the petition. If it be true that the lease between the Investment Company and The Oriental was simulated, and a mere sham intended to conceal the true facts, and if in fact the Investment Company was operating the hotel, then we think that the company would be liable to an employe, although the contract of employment was made after its ostensible relation was created. This was a question for the jury to determine. We conclude that this assignment is without merit. These remarks also dispose of the seventh assignment adversely to appellant.

5. The eighth assignment of error asserts that the first question submitted to the jury and the answer thereto is not a sufficient basis for the judgment. The judgment does not purport to be based solely on that question and answer. It is based upon the verdict of the jury in answer to all the issues submitted to them in the form of questions. We think they constitute a sufficient basis for the judgment.

6. The eleventh assignment complains that the court erred in rendering judgment against defendant based upon the answer of the jury to the second question propounded to them in the general charge, because

so much of said answer as stated The Oriental was not running in its own behalf, but was acting for the Oriental Investment Company, was not in response to the question, and was but a conclusion of law, and same was not sufficient to support a judgment predicated upon the theory that The Oriental was not a lessee, but was an agent, of defendant. As already stated, the judgment is not based on any single finding, but upon the entire findings of the jury. It is clear that the jury understood the interrogatory propounded to submit the question of agency, and we think that such is the effect of the question, and that the answer is responsive and proper.

7. The sixteenth assignment complains of the action of the court in refusing the following charge requested by appellant: "The court declares the law to be, and instructs the jury, that there is no evidence before them which will authorize them to find against defendant in these cases on the ground that defendant was the owner of The Oriental, the Dallas corporation, or of its capital stock, or any part of it." The charge was properly refused. The pleadings of plaintiffs did not assert liability on the part of the Investment Company because it owned the hotel, but charged that it was operating it at the time of the accident, and for this reason, among others, it was liable.

8. The special charge requested by appellant, the refusal of which is made the ground of the nineteenth assignment of error, was on the weight of the evidence, and was therefore properly refused.

9. The special charge requested by appellant, the refusal of which is made the ground of the twentieth, twenty-first, and twenty-fifth assignments of error, were properly refused. No attack was made on the validity of the corporation, The Oriental. The charges were not called for by the facts.

10. The twenty-eighth assignment complains of the action of the court in calling the attention of the jury to the conflict in certain of their answers, and in sending them back to their room. The answers in which there was a conflict related solely to the issue as to whether the Investment Company exercised ordinary care and diligence in providing and maintaining a safe elevator. This issue was submitted to the jury in a different form in six interrogatories propounded to them. Their answers to four of these interrogatories were in favor of plaintiffs, and two were answered in favor of defendant. We are of opinion that the verdict as first tendered to the court is not responsive to the issue, in that it fails to find thereon. In such a case it is provided by statute that, "If the verdict is not responsive to the issue submitted to the jury, the court shall call their attention thereto, and send them back for furher deliberation." Rev. Stats., art. 1327. By the terms of this statute, when the jury tendered to the trial court their findings upon this issue, it was his duty to call their attention to the issue to which there had not been a full response, and let them return for further deliberation. The trial court did not err in this respect.

11. The assignments not discussed are without merit and are overruled.

Finding no error in the record, the judgment is affirmed.

*Affirmed.*

Writ of error refused.