## ANDERSON, RECEIVER, *v.* ABBOTT, ADMINISTRATRIX, ET AL.

No. 3. Argued February 8, 1943. Reargued January 12, 13, 1944.—Decided March 6, 1944.

350

*Mr. Robert S. Marx,* with whom *Messrs. Frank E. Wood, Edward M. Brown, Harry Kasfir,* and *John F. Anderson* were on the briefs, for petitioner.

*Mr. William W. Crawford* made the original argument and *Mr. Allen P. Dodd* the reargument—*Messrs. Henry E. McElwain, Jr., Richard P. Dietzman, James W. Stites, Edward P. Humphrey,* and *Lafon Allen* were with them on the briefs—for respondents.

*Mr. Henry M. Johnson* filed a brief on behalf of Susie E. Tellman and other purchasers of holding-company shares, as *amici curiae.*

Mr. Justice Douglas delivered the opinion of the Court.

The primary question in this case is whether on these facts shareholders of a bank-stock holding company are liable under § 23 of the Federal Reserve Act, 12 U. S. C.

§ 64, and § 12 of the National Bank Act, 12 U. S. C. § 63, for an assessment on shares of a national bank in the portfolio of the holding company.

The essential facts [1] may be briefly stated.

BancoKentucky Company was organized under the laws of Delaware in July, 1929. It had broad charter powers in the field of finance. It was organized by the management of the National Bank of Kentucky and of the Louisville Trust Company—banking houses doing business at Louisville. Banco perfected the desired alliance between them by acquiring most of their shares [2] in exchange for its shares. The Bank, the Trust Company, and Banco each had the same directors and certain common officers. Some of the shareholders who made the exchange also purchased additional shares of Banco stock at $25 per share. Banco stock was also sold at that price on the market to those who did not own any shares in the Bank or the Trust Company. All told some $9,900,000 in cash was realized by Banco from the sale of its shares— about $6,000,000 of which was financed on loans from the Bank and from the Trust Company. Banco's stock certificates stated that the shares were "full-paid and nonassessable." Its certificate of incorporation provided that the stockholders' property should "not be subject to the payment of corporate debts to any extent whatever."

The closing date for the exchange of shares was September 19, 1929. Beginning about September 25, 1929, Banco acquired a majority stock interest in each of five

---

[1] Further details concerning the financial transactions indirectly involved in this litigation may be found in *Atherton* v. *Anderson*, 86 F. 2d 518, 99 F. 2d 883; *BancoKentucky's Receiver* v. *Louisville Trust Co.'s Receiver*, 263 Ky. 155, 92 S. W. 2d 19.

[2] The shares of the Bank and the Trust Company had been earlier transferred to trustees who issued Trustees' Participation Certificates. It was these certificates which Banco received from the shareholders of the two banks in exchange for its shares. The command which Banco had over the underlying shares is described in *Laurent* v. *Anderson*, 70 F. 2d 819.

banks in Kentucky and two banks in Ohio, and a minority stock interest in another bank in Kentucky. Of these eight banks, two were national. The shares of the state, as well as the national, banks in the group carried a double liability.[3] The price paid for the shares in these banks was about $11,500,000—of which some $6,500,000 was paid in cash and $5,000,000 in Banco's shares. Not all of Banco's funds were invested in bank shares. It acquired for $2,000,000 a $2,000,000 note of its president.[4] It purchased 625 shares of a life insurance company for $25,000 cash. It purchased and retired 106,000 of its own shares at a cost of over $2,300,000—some $275,000 less than Banco received for them. It received dividends of about $1,180,000 on the bank stocks owned by it and paid them out at once as dividends on its own shares. It borrowed $2,600,000 from a New York bank and paid back $1,000,-000. With $600,000 of that loan it purchased from the Bank certain dubious assets [5]—a transaction which the

---

[3] See Ky. Rev. Stat. 1942, § 287.360; Ohio Code Ann. 1940, § 710-75. At or about the time of Banco's failure the shares in the other banks were sold or disposed of at rather nominal prices. It appears that the closing of the Bank was followed by heavy runs on these other banks; and the local interests in most of the cities where the banks were located were willing to support the banks to keep them open if Banco would surrender control. Banco, it seems, was also anxious to avoid double liability on those shares.

[4] The president of Banco was also president of the Bank. This note was acquired in November, 1929, from Wakefield & Co. It was secured by 60,000 shares of Banco stock and 22,500 shares of stock of Standard Oil of Kentucky. Nothing was ever paid on the note. Nothing was realized on the Banco stock. Some $440,000 was realized on the Standard Oil stock. In December 1930 the president of Banco and maker of the note filed a voluntary petition in bankruptcy. He was discharged. Wakefield & Co. made an assignment for the benefit of creditors in 1931 and apparently no dividends have yet been paid its creditors.

[5] These were a Murray Rubber note in the amount of $580,000 and a note of Lewis C. Humphrey for $20,000—of which the bank examiner had been quite critical for some time.

Kentucky court later set aside. *BancoKentucky's Receiver* v. *National Bank of Kentucky's Receiver,* 281 Ky. 784, 137 S. W. 2d 357. It was negotiating for the purchase of the shares of an investment banking house when that house, the Bank and the Trust Company failed. That was in November, 1930—a little more than a year after Banco began its financial career. In November, 1930 a receiver was appointed for the Bank and one for Banco. In February, 1931 the Comptroller of the Currency made an assessment on the shareholders of the Bank in the amount of $4,000,000 payable on or before April 1, 1931. And in March, 1931 the receiver of the Bank notified the stockholders of Banco that he had demanded payment of the assessment from the receiver of Banco and that he intended to proceed against them for collection of the assessment to the extent that he was unable to collect from Banco. In October, 1931 the receiver of the Bank brought an action against Banco as holder of substantially all of the Bank's shares. He obtained a judgment (*Keyes* v. *American Life Ins. Co.,* 1 F. Supp. 512) which was affirmed on appeal. *Laurent* v. *Anderson,* 70 F. 2d 819. Some $90,000 was paid on that judgment. The receiver of the Bank thereupon brought this suit against those stockholders of Banco who resided in the Western District of Kentucky in which he seeks to recover from each his proportionate part of the balance of the assessment. Similar suits against other stockholders were brought in federal district courts in other states. The District Court, after a trial, dismissed the bill. 32 F. Supp. 328. The Circuit Court of Appeals affirmed that judgment. 127 F. 2d 696. The case is here on certiorari.

## I.

We are met at the outset with the contention that the decision in *Laurent* v. *Anderson, supra,* holding Banco liable on the assessment, is *res judicata* of the present claim;

and that petitioner by bringing that suit made an election which bars the present action. We do not agree. Either the record owner or the actual owner of shares of a national bank may be liable on the statutory assessment.[6] *Richmond* v. *Irons*, 121 U. S. 27, 58; *Keyser* v. *Hitz*, 133 U. S. 138, 149; *Pauly* v. *State Loan & Trust Co.*, 165 U. S. 606; *Lantry* v. *Wallace*, 182 U. S. 536; *Ohio Valley National Bank* v. *Hulitt*, 204 U. S. 162; *Early* v. *Richardson*, 280 U. S. 496; *Forrest* v. *Jack*, 294 U. S. 158. A receiver may sue both—partial satisfaction of the judgment against one being a *pro tanto* discharge of the other. *Ericson* v. *Slomer*, 94 F. 2d 437. And see *Continental National Bank & Trust Co.* v. *O'Neil*, 82 F. 2d 650. The basis of liability of each is different—apparent or titular ownership in one case, actual or beneficial ownership in the other. Hence the issues involved in each suit are not the same.[7] See *Reconstruction Finance Corp.* v. *Pelts*, 123 F. 2d 503; *Reconstruction Finance Corp.* v. *Barrett*, 131 F. 2d 745, 748. If the receiver were barred from proceeding against one because he had already proceeded against the other, creditors of banks would be deprived of the full benefits of these statutes. The wisdom of the receiver's first suit rather than the fixed statutory liability would be the measure of their protection. There is no justification for such an impairment of the statutory scheme. The rules of election applicable to suits on contracts made by agents of undisclosed principals

---

[6] Provisions for the termination of double liability on shares of national banks are contained in the Act of June 16, 1933, 48 Stat. 189, and the Act of August 23, 1935, 49 Stat. 708, 12 U. S. C. § 64a.

[7] It is true that the court in *Laurent* v. *Anderson, supra,* stated that Banco was "in every sense the true and beneficial owner" of the shares of the Bank. 70 F. 2d p. 824. But it is apparent from the opinion that the court was answering the contention that the trustees of the participation certificates were responsible for the assessment. Banco's defense was based on § 63 of the National Bank Act. It argued that under that section only funds in the hands of the trustees were liable That argument was rejected by the court.

(*Pittsburgh Terminal Coal Corp.* v. *Bennett*, 73 F. 2d 387, 389) have been pressed upon us. But they have no application to suits to enforce a liability which has this statutory origin. Cf. *Christopher* v. *Norvell*, 201 U. S. 216, 225.

## II.

The District Court found, and the Circuit Court of Appeals agreed, that Banco was organized in good faith and was not a sham; that it was not organized for a fraudulent purpose or to conceal enterprises conducted for the benefit of the Bank; that it was not a mere holding company; that it was not formed as a means for avoiding double liability on the stock of the Bank; and that the soundness of the Bank and its ability to meet the obligations could not be questioned until after the formation of Banco. Some of these findings have been challenged. But we do not stop to examine the evidence. We accept those findings, as they were concurred in by two courts and no clear error is shown. *Brewer-Elliott Oil Co.* v. *United States,* 260 U. S. 77, 86; *Alabama Power Co.* v. *Ickes,* 302 U. S. 464, 477. We conclude, however, that the courts below erred in dismissing the bill.

It is clear by reason of *Early* v. *Richardson, supra,* that if a stockholder of the Bank had transferred his shares to his minor children, he would not have been relieved from liability for this assessment. And see *Seabury* v. *Green,* 294 U. S. 165. That follows because of the policy underlying these statutes. One who is legally irresponsible cannot be allowed to serve as an insulator from liability, whether that was the purpose or merely the effect of the arrangement. A father who transfers his shares to his minor children has not found a substitute for his liability. See *Weston's Case,* 5 Ch. App. 614. It does not matter that the transfer was in good faith, without purpose of evasion and at a time when the bank was solvent. *Early* v. *Richardson, supra.* The vice of the arrangement is

found in the nature of the transferee and his relationship to the transferor. Cf. *Nickalls* v. *Merry*, 7 Eng. & Irish App. 530. The same result will at times obtain where the transferee is financially irresponsible. This does not mean that every stockholder of a national bank who sells his shares remains liable because his transferee turns out to be irresponsible or impecunious. It is clear that he does not. *Earle* v. *Carson*, 188 U. S. 42, 54–55. But where after the sale he retains through his transferee an investment position in the bank, including control, he cannot escape the statutory liability if his transferee does not have resources commensurate with the risks of those holdings. In such a case he remains liable as a "stockholder" or "shareholder" within the meaning of these statutes to the extent of his interest in the underlying shares of the bank. For he retains control and the other benefits of ownership without substituting in his stead any one who is responsible for the risks of the banking business. The law has been edging towards that result. See *Hansen* v. *Agnew*, 195 Wash. 354, 80 P. 2d 845; *Metropolitan Holding Co.* v. *Snyder*, 79 F. 2d 263; *Barbour* v. *Thomas*, 86 F. 2d 510; *Nettles* v. *Rhett*, 94 F. 2d 42. We think the result is necessary, lest the protection afforded by these double liability provisions be lost through transfers to impecunious or not fully responsible holding or operating companies whose stock is owned by the transferor. Whether the transfer is made in avoidance of the double liability as in *Corker* v. *Soper*, 53 F. 2d 190, or for business reasons which may be considered wholly legitimate, the result is the same. Depositors are deprived of the benefit of double liability in either event.

Thus it is no bar to the present suit that Banco was organized in good faith, that there was no fraudulent intent, that Banco was not a sham, that it was not a mere holding company, or that the shareholders of the Bank had no purpose of avoiding double liability. We are not

concerned with any question of good intention. The question is whether the parties did what they intended to do and whether what they did contravened the policy of the law. By that test it is clear to us that the old stockholders of the Bank are liable. For they retained through Banco their former investment positions in the Bank, including control, and did not constitute Banco as an adequate financial substitute in their stead. Banco's asset position immediately after its sales of stock cannot be taken as the measure of its financial responsibility. Its liquid condition was fleeting; the raising of the cash was but an interim step in the planned evolution of Banco as a bank-stock holding company. It is the condition of Banco at the end of the promotion which is significant. Banco emerged as a bank-stock holding company. Technically it was not merely such a holding company as it had other interests and investments. But its main assets were stocks in banks, stocks which carried double liability. Its other assets—apart from the $25,000 of life insurance stock—were always highly suspect and dubious. In substance Banco as a going concern had no free assets which could possibly be said to constitute an adequate reserve against double liability on the bank stocks which it held. It was in no true sense comparable to an investment trust or holding company which holds bank stock in a diversified portfolio. If the small amount of life insurance stock be left out of account, the situation is in point of fact not materially different from the case where the only assets held were bank stocks carrying double liability. Such an arrangement, if successful, would allow stockholders of banks to retain all of the benefits of ownership without the double liability which Congress had prescribed. The only substitute which depositors of one bank would have for that double liability would be the stock in another bank carrying a like liability. The sensitiveness of one bank in the group to the disaster of another would likely mean

that at the only time when double liability was needed the financial responsibility of the holding company as stockholder would be lacking. However that may be, the device used here can be so readily utilized in circumvention of the statutory policy of double liability that the stockholders of the holding company rather than the depositors of the subsidiary banks must take the risk of the financial success of the undertaking.[8]

That is a basis of liability sufficiently broad to include also the stockholders of Banco who had not been stockholders of the Bank. As we have noted, many of them acquired their shares either for cash or for shares in other banks. It must be assumed that in making those purchases or effecting those exchanges they knew what kind of an enterprise Banco was. See *Nettles* v. *Rhett, supra,* pp. 48–49; *Anderson* v. *Atkinson,* 22 F. Supp. 853, 863. Circulars of the Chicago Stock Exchange, on which Banco's shares were listed, gave a plain indication of the nature

---

[8] The history of bank-stock holding companies shows that their organizers were acutely aware of this problem and at times took steps to protect the depositors of the subsidiary banks on possible assessments on the bank stocks. One holding company is said to have kept "at all times an amount in cash or its equivalent equal to our aggregate stockholders' liability on the bank stocks owned by us." Branch, Chain, and Group Banking, Hearings under H. Res. 141, 71st Cong., 2d Sess. (1930) p. 1181. A similar method was for the holding company "to carry in its treasury a large reserve of readily marketable securities which may be liquidated in order to make good any shareholders' liability that may be imposed upon the holding company." Bonbright & Means, The Holding Company (1932), p. 331. Cf. Nineteenth Annual Report, Superintendent of Banks of California (1928), p. 21. Another method of safeguarding the depositors was to make express provision in the charter of the holding company that its stockholders were ratably liable for any statutory liability imposed on it by reason of its ownership of bank stocks. Branch, Chain, and Group Banking, *op. cit.,* pp. 1042–1043; *Barbour* v. *Thomas,* 86 F. 2d 510, 513–514. Wisconsin provided for such a liability by statute. Wis. Stat. 1941, § 221.56.

of the enterprise.[9]   So did circulars of dealers.[10]   And there would not seem to be any doubt that the old stockholders of the Bank were given at the time of the exchange a fair

[9] "The BancoKentucky Company was organized under the laws of the State of Delaware on July 16, 1929, with an authorized capital of 2,000,000 shares of $10 par value.   The Company was organized for the purpose of owning a controlling interest in state and national banks located primarily in Kentucky, Ohio and Indiana.   Its charter gives it broad powers entitling it to engage in a wide range of investment and other activities.

"The BancoKentucky Company has acquired, through an exchange of stock, nearly 100% of the shares of the National Bank of Kentucky-Louisville Trust Company, and in addition its stockholders have subscribed to 480,000 shares of its stock for cash.   This cash will be used for acquiring majority interests in other banks and for other corporate purposes."

In listing its shares on the Chicago Stock Exchange it gave the Exchange the following description of its business:

"(b) *Primary purpose:* To acquire control and operate Banks and Trust Companies.

"(c) *Nature of Business:* This company has not engaged in the business of investing and reinvesting in a diversified list of securities of other corporations for revenue and profit, but has limited its activities to acquiring control of Banks and Trust Companies and the operation of same."

[10] Thus a circular of Blyth & Co. stated:

"The BancoKentucky Company was recently formed to acquire and hold controlling interests in commercial banks throughout the Middle West.   By charter, broad powers are conferred upon the Company, so that all types of operations in the financial field are permitted but no investments are contemplated other than controlling interests in financial institutions.

"Upon completion of present transactions the Company will control the National Bank of Kentucky, organized in 1834, the Louisville National Bank and Trust Co., organized in 1884 as Louisville Trust Company, both of Louisville, Ky., the Pearl Market Bank & Trust Co., organized 1907, and the Brighton Bank & Trust Co., organized 1898, both of Cincinnati, Ohio, and the Central Savings Bank and Trust Company, organized 1906, of Covington, Ky.   In addition, the Company has funds of approximately $6,000,000, which are expected to be used for the acquiring of additional banking institutions."

picture of the nature of the enterprise which Banco was about to launch. Some shareholders of Banco claim the right to rescind their purchases of its shares on the ground of misrepresentations in the sale. But whether or not such relief might be granted in some instances, it seems clear that Banco's stockholders are bound by the decisions of the directors which determined, within the scope of the corporate charter, the kind and quality of the corporate undertaking. As was stated in *Christopher* v. *Brusselback,* 302 U. S. 500, 503, "A stockholder is so far an integral part of the corporation of which he is a member, that he may be bound and his rights foreclosed by authorized corporate action taken without his knowledge or participation. *Sanger* v. *Upton,* 91 U. S. 56, 58." And see *Pink* v. *A. A. A. Highway Express,* 314 U. S. 201, 207, and cases cited. The legality of the investments of Banco's funds for the most part is not challenged. It must be assumed that they were not *ultra vires.* They fall indeed into the category of acts of directors which normally cannot be challenged by stockholders. Cook, Corporations (8th ed.) § 684. These principles, basic in general corporation law, are relevant here as indicating that the stockholders of Banco cannot escape responsibility for the inadequacy of Banco's resources merely because the choice of its investments was made by the officers and directors— acts in which the stockholders did not participate and of which perhaps they had no actual knowledge. The fact that they may have claims against an officer or director for mismanagement does not relieve them from liability to the depositors of the subsidiary banks. Cf. *Scott* v. *DeWeese,* 181 U. S. 202, 213; *Lantry* v. *Wallace,* 182 U. S. 536, 548–554.

Normally the corporation is an insulator from liability on claims of creditors. The fact that incorporation was desired in order to obtain limited liability does not defeat that purpose. *Elenkrieg* v. *Siebrecht,* 238 N. Y. 254, 144

N. E. 519. See 7 Harv. Bus. Rev. 496. Limited liability is the rule, not the exception; and on that assumption large undertakings are rested, vast enterprises are launched, and huge sums of capital attracted. But there are occasions when the limited liability sought to be obtained through the corporation will be qualified or denied. Mr. Justice Cardozo stated that a surrender of that principle of limited liability would be made "when the sacrifice is essential to the end that some accepted public policy may be defended or upheld." *Berkey* v. *Third Ave. Ry. Co.*, 244 N. Y. 84, 95, 155 N. E. 58, 61; *United States* v. *Milwaukee Refrigerator Transit Co.*, 142 F. 247. See Powell, Parent & Subsidiary Corporations (1931) pp. 77–81. The cases of fraud make up part of that exception. *Linn & Lane Timber Co.* v. *United States*, 236 U. S. 574; *Rice* v. *Sanger Brothers*, 27 Ariz. 15, 229 P. 397; *Donovan* v. *Purtell*, 216 Ill. 629, 640, 75 N. E. 334; *George* v. *Rollins*, 176 Mich. 144, 142 N. W. 337; *Higgins* v. *California Petroleum Co.*, 147 Cal. 363, 81 P. 1070. But they do not exhaust it. An obvious inadequacy of capital, measured by the nature and magnitude of the corporate undertaking, has frequently been an important factor in cases denying stockholders their defense of limited liability. *Luckenbach S. S. Co.* v. *Grace & Co.*, 267 F. 676, 681; *Oriental Investment Co.* v. *Barclay*, 25 Tex. Civ. App. 543, 559, 64 S. W. 80, 88. And see *Weisser* v. *Mursam Shoe Corp.*, 127 F. 2d 344. Cf. *Pepper* v. *Litton*, 308 U. S. 295, 310; *Albert Richards Co.* v. *Mayfair, Inc.*, 287 Mass. 280, 288, 191 N. E. 430; *Erickson* v. *Minnesota & Ontario Power Co.*, 134 Minn. 209, 158 N. W. 979. That rule has been invoked even in absence of a legislative policy which undercapitalization would defeat. It becomes more important in a situation such as the present one where the statutory policy of double liability will be defeated if impecunious bank-stock holding companies are allowed to be interposed as non-conductors of liability. It has often

been held that the interposition of a corporation will not be allowed to defeat a legislative policy, whether that was the aim or only the result of the arrangement. *United States* v. *Lehigh Valley R. Co.*, 220 U. S. 257; *Chicago, M. & St. P. Ry. Co.* v. *Minneapolis Civic & Commerce Assn.*, 247 U. S. 490; *United States* v. *Reading Co.*, 253 U. S. 26. The Court stated in *Chicago, M. & St. P. Ry. Co.* v. *Minneapolis Civic & Commerce Assn.*, *supra*, p. 501, that "the courts will not permit themselves to be blinded or deceived by mere forms or law" but will deal "with the substance of the transaction involved as if the corporate agency did not exist and as the justice of the case may require." We are dealing here with a principle of liability which is concerned with realities not forms. As we have said, the net practical effect of the organization and management of Banco was the same as though the shares of the Bank were held in trust for beneficiaries who were in point of substance its only owners. Those who acquired shares of Banco did not enter upon an enterprise distinct from the banking business. Their investment in Banco was in substance little more than an investment in the shares of the Bank. They were as much in the banking business as any stockholder of the Bank had ever been. And they continued in that business through Banco which as a going concern lacked assets adequate as a reserve against the contingent statutory liability. Its stockholders were in point of substance the only source of funds available to satisfy the assessments. For these reasons the old group of stockholders must be held to have retained and the new group of stockholders must be held to have acquired liability as stockholders of the Bank.

To allow this holding company device to succeed would be to put the policy of double liability at the mercy of corporation finance. The fact that Congress did not outlaw holding companies from the national bank field nor undertake to regulate them during the period of Banco's

existence can hardly imply that Congress sanctioned their use to defeat the policy of double liability. It is true that Congress later addressed itself to this problem and in the Banking Act of 1933 (48 Stat. 186, 12 U. S. C. § 61) established certain controls over them. In general, the Board of Governors of the Federal Reserve System was authorized to issue a voting permit entitling a holding company to vote the stock controlled by it on certain conditions. Apart from requirements for examination and non-affiliation with securities companies, § 19 (a) and (e), certain standards for financial responsibility were established and holding companies seeking such permits were granted a specified period of time within which to meet those standards. Where the stockholders of the holding company were liable for the statutory liability, a specified reserve of readily marketable assets was required. § 19 (c). Otherwise, the holding company was required to maintain free of any lien "readily marketable assets other than bank stock" in an amount equal to a larger percentage of the par value of the bank stocks owned. § 19 (b). It is apparent that Congress in that Act protected its policy of double liability by prescribing one standard of financial responsibility for holding companies whose shares were assessable by their terms and another for those whose shares were non-assessable.[11] We need not stop to consider what would be the measure of liability in cases arising under that Act where there had been no compliance with it. But if that Act had been

---

[11] As stated in S. Rep. No. 77, 73d Cong., 1st Sess., p. 11: "The affiliates of this type (holding companies) are prohibited from voting the stocks of national banks unless they are willing to undertake to accept examination by the Federal Reserve Board, divest themselves of ownership of stock and bond financing concerns, and comply with regulations designed to insure their ownership of sufficient free assets to make sure that they can satisfy the double liability of their shareholders in case any of the banks owned by such a company should go into the hands of receivers or be closed."

applicable to Banco and Banco had complied with it, Banco would then have met the standards of financial responsibility which Congress had prescribed as adequate for the depositors. Yet the fact that Congress later wrote specific standards into the law means no more than a recognition on its part of an evil and a fashioning by it of a specific remedy. It can hardly mean that Congress by its earlier silence had sanctioned the use of the holding company to defeat the protection which it had provided for depositors of national banks. The legislative policy which Congress had long announced was the policy of double liability. It is that policy with which we are here concerned. It is that policy, declared by Congress, which the judicial power may appropriately protect in the way we have indicated, in absence of a choice by Congress of another method.

It is of course true that Delaware created this corporation. But the question of liability for these assessments is a federal question. The policy underlying a federal statute may not be defeated by such an assertion of state power. *Northern Securities Co.* v. *United States,* 193 U. S. 197, 349; *Seabury* v. *Green, supra.* The spectre of unlimited liability for stockholders has been raised. But there is no cause for alarm. Barring conflicting federal incorporation statutes, Delaware may choose such rules of limitation on the liability of stockholders of her corporations as she desires. And those laws are enforceable in federal courts under the rule of *Erie R. Co.* v. *Tompkins,* 304 U. S. 64. But no State may endow its corporate creatures with the power to place themselves above the Congress of the United States and defeat the federal policy concerning national banks which Congress has announced. We are concerned here with that problem and with that problem alone.

The result which we reach may be harsh to some of the stockholders of Banco. But rules of liability are usually

harsh especially where they are not bottomed on fault. Thus private investors have frequently found contrary to their expectation or understanding that they purchased with their investment an unlimited liability for the debts of the enterprise. *Thompson* v. *Schmitt,* 115 Tex. 53, 274 S. W. 554; *Frost* v. *Thompson,* 219 Mass. 360, 106 N. E. 1009; *Weber Engine Co.* v. *Alter,* 120 Kan. 557, 245 P. 143; *Rand* v. *Morse,* 289 F. 339. It has never been supposed, however, that the innocence and good faith of investors were barriers to such suits. *Horgan* v. *Morgan,* 233 Mass. 381, 385, 124 N. E. 32. Nor can we accede to the suggestion that those defenses should be available here. The policy underlying double liability is an exacting one. Its defeat cannot be encouraged through the utilization of financial devices which put a premium on ignorance.

The suggestion that there should be no liability without fault unless a statute establishes it denies the whole history of the judicial process in shaping the rules of vicarious liability. The liability of a master for the torts of his servant certainly started from no such foundation. And the rules which made those who purchased shares in Massachusetts business trusts responsible for the debts of the enterprise were evolved, with few exceptions, on a common law, not a statutory, basis. Magruder, The Position of Shareholders in Business Trusts, 23 Col. L. Rev. 423. In the field in which we are presently concerned, judicial power hardly oversteps the bounds when it refuses to lend its aid to a promotional project which would circumvent or undermine a legislative policy. To deny it that function would be to make it impotent in situations where historically it has made some of its most notable contributions. If the judicial power is helpless to protect a legislative program from schemes for easy avoidance, then indeed it has become a handy implement of high finance. Judicial interference to cripple or defeat a legislative policy is one thing; judicial interference with

the plans of those whose corporate or other devices would circumvent that policy is quite another. Once the purpose or effect of the scheme is clear, once the legislative policy is plain, we would indeed forsake a great tradition to say we were helpless to fashion the instruments for appropriate relief.

In summary, we see no difference between the various classes of stockholders of Banco which would support a difference in their liability. Those who purchased stock of Banco for cash were as much participants in the banking business as those who acquired their stock in exchange for shares of the Bank. Together they shared the benefits of ownership of the subsidiary banks, including control. Certainly a sale of shares of Banco by the old stockholders of the Bank did not give those shares an immunity bath. To draw distinctions between the classes of stockholders of Banco would be to make the protection afforded by these statutes turn on accidents of acquisition quite irrelevant to the concept of "stockholders" or "shareholders" on whom Congress placed this liability. One simple illustration will make that plain. A purchases shares of an underlying bank for $10,000 in cash and exchanges those shares for shares of Banco. B hands over to Banco $10,000, Banco purchases the shares of the underlying bank, and then issues its shares to B. From the practical point of view A and B are investors of the same class. To say that A is liable and B not liable when both start with cash and end with identical investments is to make the difference between liability and no liability turn on distinctions which have no apparent relevancy to the legislative policy which the rule of double liability was designed to protect. And to say that courts may hold A liable but not B is to make the occasions for the assertion of judicial power turn on whimsical circumstances.

The final suggestion is that the old stockholders of the Bank remain liable for the full assessment on the shares

of the Bank which they exchanged for shares of Banco. But that overlooks the fact that their interest in those underlying shares was diluted by the issuance of Banco's shares to others.[12] Double liability is an incidence of ownership. It has long been held that a stockholder who in good faith parts with all his interest in the shares rids himself of that double liability, even though his transferee is not responsible. *Earle* v. *Carson, supra.* We could hardly adhere to that principle and still hold the old stockholders of the Bank liable for the full assessment on the shares which they exchanged for shares of Banco. The other stockholders of Banco acquired through their investment in it an interest in the shares of the Bank. To the extent of that interest the beneficial ownership of the old stockholders of the Bank in its shares was as definitely reduced as if they had made a transfer of that part of their holdings.

Certain stockholders of Banco claim that they are entitled to rescind their purchases of Banco's shares because of misrepresentations made to them when they acquired the shares. We do not reach those questions. Nor do we stop to determine whether such a defense would avoid liability on the assessment (cf. *Oppenheimer* v. *Harriman National Bank & Trust Co.,* 301 U. S. 206) and, unlike the case where some shareholders are insolvent (*United States* v. *Knox,* 102 U. S. 422, 425), increase the *pro rata* liability of the other shareholders of Banco. It is sufficient at this time to state that the liability of the shareholders of Banco would be measured by the number of

---

[12] The old stockholders of the Bank have a lesser interest in the shares of the Bank than they had prior to the exchange. Their interest in the shares of the Bank decreased proportionately with the increase in the outstanding stock of Banco. That resulted in a *pro rata* reduction in their liability. The other group of stockholders of Banco acquired that portion of the liability of which the old stockholders of the Bank were relieved.

shares of stock of the Bank, whether several or only fractional, represented by each share of stock of Banco; and that the assessment liability of each share of stock of Banco would be a like proportion of the assessment liability of the shares of the Bank represented by the former.

The judgment of the Circuit Court of Appeals is reversed and the cause is remanded to the District Court for proceedings in conformity with this opinion.

*Reversed.*

MR. JUSTICE JACKSON, dissenting:

MR. JUSTICE ROBERTS, MR. JUSTICE REED, MR. JUSTICE FRANKFURTER, and I find ourselves unable to join in the judgment of the Court.

The Court accepts concurrent findings of fact by the two lower courts, but reverses their concurrent judgment. It holds that the findings establish liability as matter of law on two very different kinds of stockholdings: (1) holding company stock taken in exchange for double liability stock of the National Bank of Kentucky; and (2) holding company stock bought and fully paid for in cash. We think holders of the latter are not liable on any principle heretofore known to the law and that if owners of the former are to be held it must be on a quite different principle than that stated by the Court.

## I.

Former National Bank of Kentucky stockholders had stock in the Bank itself which carried double liability.[1]

---

[1] The pertinent sections of the Bank Act follow:

"The shareholders of every national banking association shall be held individually responsible . . . for all contracts, debts, and engagements of such association, to the extent of the amount of their stock therein, at the par value thereof, in addition to the amount invested in such shares; . . ." 12 U. S. C. § 63.

"The stockholders of every national banking association shall be held individual responsible for all contracts, debts, and engagements of

The Bank failed November 30, 1930, and if they had then held that stock, each would have been liable for assessment upon his shares. The aggregate assessment was $4,000,000. Only about a year before the failure, on September 19, 1929, this double-liability bank stock was exchanged for shares of the holding company purporting to be fully paid and nonassessable. At the same time Bank of Kentucky stockholders also bought additional holding company stock for cash to the amount of $4,471,-950. Bank of Kentucky stockholders as a group thus paid into the holding company cash more than sufficient to meet the assessment now levied. In addition to that, investors who were not connected with the Bank bought shares for cash amounting to $5,397,000. The Court nevertheless holds that the Bank of Kentucky stockholders contravened the policy of the law and are subject to the double liability because they "did not constitute Banco as an adequate financial substitute in their stead." We do not see how such a statement of fact, and it certainly is not a matter of law, can be conformable with acceptance of the findings of fact of the courts below. Nor are we able to reconcile the view that "the old group of stockholders must be held to have retained . . . *liability as stockholders of the Bank*" with the one later expressed that their interest was "diluted" so as to give them a *pro rata* reduc-

---

such association, each to the amount of his stock therein, at the par value thereof in addition to the amount invested in such stock. The stockholders in any national banking association who shall have transferred their shares or registered the transfer thereof within sixty days next before the date of the failure of such association to meet its obligations, or with knowledge of such impending failure, shall be liable to the same extent as if they had made no such transfer, to the extent that the subsequent transferee fails to meet such liability; but this provision shall not be construed to affect in any way any recourse which such shareholders might otherwise have against those in whose names such shares are registered at the time of such failure." 12 U. S. C. § 64.

tion of liability. (See note 12 of the opinion of the Court.) (Emphasis supplied.) It seems to us that the transfer of their bank stock to the holding company either was valid, in which case it relieved of all liability; or it was invalid, in which case it relieved of no liability. The doctrine that a transfer may be good enough to dilute liability but bad enough to carry along a part of it is new to us and we have difficulty grasping its implications.

We are, however, agreed that it would be a proper use of the power of this Court for it to examine the evidence that lies back of these findings and determine whether clear error has been committed and whether the conditions disclosed are such that a *bona fide* transfer of the stock took place sufficient to shake off double-liability obligations.

In spite of the exchange of National Bank of Kentucky stock, its stockholders through the holding company kept both a large measure of control of the Bank and the benefits of investment in it. They, or those acting in their behalf, had determined the policy of the holding company, had sponsored its representatives, and had selected its officers and personnel, including the manager who proved to be false to his trust. There is evidence that the National Bank of Kentucky had for some time been under criticism by the Comptroller for many of its loans and some of its policies, although it is found not to have been insolvent. The exchange did not consist of individual acts but was a concerted movement, planned by the Bank management, by which the holding company absorbed all of the stockholdings and all of the double liability.

The Court might properly, if examination of the evidence should warrant it, reach a legal conclusion that the double liability of the stockholders of the National Bank of Kentucky survives the exchange and that those who have continued their interest in the Bank through the holding company are liable upon assessment in the same manner and to the extent that they would have been had

the holding company transactions never occurred. But this would be because the formal transfer of the stock out of their own names would not be recognized as a defense. The Court's conclusion rests on a quite different theory. It concludes that the transfer was valid to relieve these stockholders of their liability *as stockholders of the Bank*, but that they became subject to a new and smaller liability *as stockholders of a holding company*. With this we cannot agree. The holding company, its financing, its management, and all that relates to it constitute relevant material as to whether under principles that have long been recognized the transfer is good. We do not think they create a new liability.

## II.

After holding that former owners of National Bank of Kentucky shares are liable because they did not find an adequate substitute for their own personal liability, the Court proceeds to hold purchasers of holding-company stock for cash to be under a substituted liability *pro tanto*. The grounds upon which Bank of Kentucky stockholders and non-Bank of Kentucky stockholders are both held seem to conflict. If the new stockholders for cash are liable it is hard to see why the old ones have not found a substitute, and if the Bank of Kentucky stockholders have not found a substitute, it is difficult to see a basis on which the new stockholders are liable.

Stock purchasers for cash have at no time owned a stock that purported to carry double liability. On the contrary, by the terms of the stock certificates and by the law of the corporation's being, their shares were fully paid and non-assessable. These stockholders cannot be said in any way to have assumed any express or implied contractual assessment liability. No statute of the United States and no applicable state statute then or since has purported to impose a double liability upon these holding-company shares.

No controlling precedent in this Court at the time these stockholders purchased or since (until today) purported to attach a double liability to such shares.[2]

---

[2] The authorities cited to support the Court's disregard of the corporate entity fall far short of persuasion. The quotation of the statement by Mr. Justice Cardozo from *Berkey* v. *Third Ave. Ry. Co.*, 244 N. Y. 84, 155 N. E. 58, 61, "that a surrender of that principle of limited liability would be made 'when the sacrifice is essential to the end that some accepted public policy may be defended or upheld'" has a very different significance in its context. The facts, including interchangeable names of parent and subsidiary, complete financial and operating domination, and use of one company's assets by the other, indicated a stronger case for disregard of the corporate fiction than do the findings here. Nevertheless, Chief Judge Cardozo considered that the corporate entity could not be disregarded in favor of a tort claimant and said: "In such circumstances, we thwart the public policy of the State instead of defending or upholding it, when we ignore the separation between subsidiary and parent, and treat the two as one."

Other cases cited afford no more support for the decision. *United States* v. *Milwaukee Refrigerator Transit Co.*, 142 F. 247, held that payments by a carrier to a corporation wholly controlled by a shipper might constitute rebates under the Elkins Act. The statements in Powell, Parent & Subsidiary Corporations, 77–81, are completely general and to be read in the light of the specific categories which precede the page citation, all of which involve active wrong by a parent corporation. *Linn & Lane Timber Co.* v. *United States*, 236 U. S. 574, involved the question whether an "instrumentality" corporation could acquire rights which would enable it to stand better than its transferor-creator. *Rice* v. *Sanger Brothers*, 27 Ariz. 15, 229 P. 397, found a corporation to be organized for fraudulent purposes and the former partners who became its stockholders were held liable. *Donovan* v. *Purtell,* 216 Ill. 629, 75 N. E. 334, holds nothing more than that an officer of a corporation who is personally guilty of fraud will be held liable therefor. *George* v. *Rollins*, 176 Mich. 144, 142 N. W. 337, stands for the proposition that equity will enforce a restrictive covenant against a successor corporation formed for the purpose of evading it. *Higgins* v. *California Petroleum Co.*, 147 Cal. 363, 81 P. 1070, held that in the circumstances certain successor corporations assumed a lease and therefore had to pay royalties; there was no disregarding of the corporate entity involved. *Luckenbach S. S. Co.* v. *Grace & Co.*, 267 F. 676,

The reason given for this decision is that "the interposition of a corporation will not be allowed to defeat *a legislative policy*" and that "no State may endow its corporate creatures with the power to place themselves above the Congress of the United States and defeat the *federal policy*

comes nearer the mark, but still is far wide of it. A steamship corporation leased its fleet of vessels to a $10,000 corporation, formed and 90 per cent owned by it, for an utterly inadequate rental. It was held that this turning over of the corporation's ships to a subsidiary which was "itself in another form" rendered the parent corporation liable for the subsidiary's breach of contract. *Oriental Investment Co.* v. *Barclay,* 25 Tex. Civ. App. 543, 64 S. W. 80, allowed a hotel employee to recover for personal injuries against the parent holding company, even though technically he was the employee of the subsidiary operating company, of whose existence he was unaware and which had been capitalized with $2,000 to operate a property whose monthly rental alone was $1,500. *Weisser* v. *Mursam Shoe Corp.,* 127 F. 2d 344, arose on dismissal of the complaint and it was held that on a full trial it might be found that the subsidiary was "only a tool of the other defendants, deliberately kept judgment-proof, to obtain the benefits of a lease with the plaintiffs without assuming any obligations. The plaintiffs allege that this was done fraudulently. . . ." *Pepper* v. *Litton,* 308 U. S. 295 and *Albert Richards Co.* v. *Mayfair, Inc.,* 287 Mass. 280, 191 N. E. 430, both dealt with cases where parent corporations claimed priority over other creditors of a subsidiary; in each, the subsidiary was held to be an instrumentality of the parent and, to avoid a fraud on creditors, the latter's claim of priority was denied. In *Erickson* v. *Minnesota & Ontario Power Co.,* 134 Minn. 209, 158 N. W. 979, a parent corporation was held liable for damage caused by a dam owned by a subsidiary; the parent paid the operating expenses of the dam, took all the earnings of the subsidiary, had a mortgage on all its assets, ad in addition had a direct right of control over the operation of the dam. *United States* v. *Lehigh Valley R. Co.,* 220 U. S. 257, and *United States* v. *Reading Co.,* 253 U. S. 26, held that a railroad's exercise of its power as a stockholder might amount to such a commingling of affairs as to make it liable for a violation of the commodities clause. *Chicago, M. & St. P. Ry. Co.* v. *Minneapolis Civic Assn.,* 247 U. S. 490, held that additional terminal charges made by a wholly owned subsidiary as compared with terminal charges by the parent might be held to constitute a discrimination.

*concerning national banks which Congress has announced."* (Italics supplied.)

We have been unable to find that Congress ever has announced a legislative policy such as the Court announces. And the Court nowhere points it out. The National Banking Act applicable at the time provided that the stockholders "of every national banking association" shall be under assessment liability. But Congress nowhere has said that the stockholders of a corporation that is not a national banking association shall be liable to assessment because the latter corporation held some or all of the stock of a national bank. Indeed, the history of banking legislation shows that Congress has considered the problems created by the holding company and not only has failed to adopt such a policy as the Court is declaring, but has made other provisions inconsistent with such a policy.

No legislation on the subject appears until 1933, when Congress enacted detailed regulation of the relations between holding companies and national banks. It required the holding company to obtain a permit to vote national bank shares and empowered the Board of Governors of the Federal Reserve System to grant or withhold the permit.[3] No permit can be granted except upon certain

---

[3] § 19 of the Banking Act of 1933, amending § 5144 of the Revised Statutes, provides in part as follows:

". . . shares controlled by any holding company affiliate of a national bank shall not be voted unless such holding company affiliate shall have first obtained a voting permit as hereinafter provided, which permit is in force at the time such shares are voted.

.      .      .      .      .

"For the purposes of this section shares shall be deemed to be controlled by a holding company affiliate if they are owned or controlled directly or indirectly by such holding company affiliate, or held by any trustee for the benefit of the shareholders or members thereof.

"Any such holding company affiliate may make application to the Federal Reserve Board for a voting permit entitling it to cast one

conditions, and assumption by holding-company stock-holders of an assessment liability is not among them. In general, they are (a) that the holding company must submit to examination in the same manner as the national bank and must publish periodic statements of condition; (b) that after five years from the statute's enactment, each holding company must possess readily marketable assets and free assets other than bank stock in a pre-

vote at all elections of directors and in deciding all questions at meetings of shareholders of such bank on each share of stock controlled by it or authorizing the trustee or trustees holding the stock for its benefit or for the benefit of its shareholders so to vote the same. The Federal Reserve Board may, in its discretion, grant or withhold such permit as the public interest may require. In acting upon such application, the Board shall consider the financial condition of the applicant, the general character of its management, and the probable effect of the granting of such permit upon the affairs of such bank, but no such permit shall be granted except upon the following conditions:

"(a) Every such holding company affiliate shall, in making the application for such permit, agree (1) to receive, on dates identical with those fixed for the examination of banks with which it is affiliated, examiners duly authorized to examine such banks, who shall make such examinations of such holding company affiliate as shall be necessary to disclose fully the relations between such banks and such holding company affiliate and the effect of such relations upon the affairs of such banks, such examinations to be at the expense of the holding company affiliate so examined; (2) that the reports of such examiners shall contain such information as shall be necessary to disclose fully the relations between such affiliate and such banks and the effect of such relations upon the affairs of such banks; (3) that such examiners may examine each bank owned or controlled by the holding company affiliate, both individually and in conjunction with other banks owned or controlled by such holding company affiliate; and (4) that publication of individual or consolidated statements of condition of such banks may be required;

"(b) After five years after the enactment of the Banking Act of 1933, every such holding company affiliate (1) shall possess, and shall

scribed amount; and (c) that after five years a holding company *whose stockholders or members are individually and severally liable* may be relieved of establishing a part of this reserve under certain circumstances. Congress was informed that some bank stock holding corporations were, by the law of the states in which they were incorporated, subject to double liability just as were stockholders of banks. It was also informed that other bank holding

continue to possess during the life of such permit, free and clear of any lien, pledge, or hypothecation of any nature, readily marketable assets other than bank stock in an amount not less than 12 per centum of the aggregate par value of all bank stocks controlled by such holding company affiliate, which amount shall be increased by not less than 2 per centum per annum of such aggregate par value until such assets shall amount to 25 per centum of the aggregate par value of such bank stocks; and (2) shall reinvest in readily marketable assets other than bank stock all net earnings over and above 6 per centum per annum on the book value of its own shares outstanding until such assets shall amount to such 25 per centum of the aggregate par value of all bank stocks controlled by it;

"(c) Notwithstanding the foregoing provisions of this section, after five years after the enactment of the Banking Act of 1933, (1) any such holding company affiliate the shareholders or members of which shall be individually and severally liable in proportion to the number of shares of such holding company affiliate held by them respectively, in addition to amounts invested therein, for all statutory liability imposed on such holding company affiliate by reason of its control of shares of stock of banks, shall be required only to establish and maintain out of net earnings over and above 6 per centum per annum on the book value of its own shares outstanding a reserve of readily marketable assets in an amount of not less than 12 per centum of the aggregate par value of bank stocks controlled by it, and (2) the assets required by this section to be possessed by such holding company affiliate may be used by it for replacement of capital in banks affiliated with it and for losses incurred in such banks, but any deficiency in such assets resulting from such use shall be made up within such period as the Federal Reserve Board may by regulation prescribe . . ." June 16, 1933, c. 89, 48 Stat. 186-7.

corporations by the law of their incorporation were not so liable.[4] It did not expressly or by implication recognize or create a uniform double liability by federal act on stockholders of state-created holding companies. It made specific provision, on the contrary, for each class of corporation. Where does this Court get authority to disregard the distinction Congress has thus created and to impose a single rule of its own making instead? When Congress has expressly set up a standard of diversification

---

[4] At the Senate hearings which preceded the Banking Act of 1933, Mr. L. E. Wakefield, vice-president of one of the largest bank holding companies, testified as follows with respect to double liability:

"Mr. Wakefield. The stockholders of the First Bank Stock Corporation, being a Delaware corporation, do not have a double liability. When we started to organize this institution we did all the work on the theory we would have it a Minnesota corporation, which would have double liability. At the last minute, when we found that every stockholder in North Dakota, South Dakota, and Montana would, in case of death, have a double inheritance tax, they complained so strongly about that situation we shifted and put it into a Delaware corporation.

.        .        .        .        .

"The other factor that we have heard discussed and that I think of in connection with banking such as we are doing is this thought in the public mind, or some minds, that, for instance, our being a Delaware corporation was intended to avoid the double liability of stockholders. I would say that if that is of importance it might easily be provided that a holding company should create a surplus account in its holdings or build up a surplus account of some proportion of the capital of the banks that should be kept in liquid securities, or something of that sort. . . ." Hearings before Senate Committee on Banking and Currency Pursuant to S. Res. 71, 71st Cong., 3d Sess., Pt. 4, pp. 616, 620.

Earlier, Mr. J. W. Pole, Comptroller of the Currency, had testified:

"Mr. Pole. We call that a group-banking system in the Northwest. In the case of the Northwest and the First Bank Stock Corporation, I think that their stock is not subject to the double liability, although the stock of some holding corporations is subject to double liability. But in the case of those two corporations, in those particular cases—

for holding company assets and has given the companies five years to meet it, from what do we derive authority to say the five-year adjustment period shall be ignored? How can we say retroactively that there is a liability for failure to do before Congress acted something which, after it did act, it expressly gave five years to do? And how can such a result be said to be an enforcement of congressional policy, which we understand to be the basis of the Court's opinion?

## III.

If to legislate were the province of this Court, we would be at liberty candidly to exercise discretion toward the

not that it obtains too generally—they have invested in securities other than bank stocks, so that a judgment against either one of those corporations would be good for the assessment.

Mr. Willis. In those particular cases?

Mr. Pole. In those particular cases; yes, sir.

Mr. Willis. But there are cases where they are not subject to the assessment?

Mr. Pole. There are cases where they are not subject to the assessment; yes, and where they hold nothing but bank stocks.

Mr. Willis. In those cases where you have an affiliated bank that buys all the stock of the bank itself, what becomes of the double liability of the shareholder?

Mr. Pole. The securities company where it buys the stock of the bank itself, would be the holder of the stock and subject to assessment.

. . . . .

Mr. Willis. Is not the double liability then very largely neutralized?

Mr. Pole. Yes.

Mr. Willis. What have you done to correct that?

Mr. Pole. We have done nothing to correct it.

Mr. Willis. What can be done by law to correct it?

Mr. Pole. That is a big problem.

Mr. Willis. Can you make a recommendation covering that along with your other problems?

Mr. Pole. Yes."

Senate Hearings, *supra*, Part 1, pp. 27–28.

For a provision extending double liability to holding-company stockholders, see Wisconsin Stat. (1943) § 221.56 (3).

undoing of the holding company. Some of us feel that as utilized in this country it is, with a few exceptions, a menace to responsible management and to sound finance, shifting control of local institutions to absentee managements and centralizing in few hands control of assets and enterprises bigger than they are able well to manage— views which are matters of record.[5]

But we are of one opinion that no such latitude is confided to judges as here is exercised. We are dealing with a variety of liability without fault. The Court is professing to impose it, not as a matter of judge-made law, but as a matter of legislative policy, and it cannot cite so much as a statutory hint of such a policy. The Court is not enforcing a policy of Congress; it is competing with Congress in creating new regulations in banking, a field peculiarly within legislative rather than judicial competence. Nor was such a policy of assessment liability one whose importance was so transcending as to set aside the policy of permitting corporate enterprise under limited liability. Congress has since repealed the double liability, even of holders of stock in national banks;[6] and when in force, it had little practical value to depositors.[7] States also have

---

[5] See 56 Reports of American Bar Association (1931) p. 763; Briefs for Government in *Electric Bond & Share Co.* v. *S. E. C.*, 303 U. S. 419; testimony in support of a proposal to withdraw from holding companies tax exemption of intercorporate dividends, Hearings before Senate Committee on Finance, on H. R. 8974, 74th Cong., 1st Sess., p. 221, *et seq.*

[6] The removal of liability is conditioned upon giving the notice prescribed. June 16, 1933, c. 89, § 22, 48 Stat. 189, Aug. 23, 1935, c. 614, § 304, 49 Stat. 708; 12 U. S. C. § 64a.

[7] Comptroller Pole stated at the Senate hearings: "We hear a good deal about double liability. It is not so important as at first one might so regard it. As an illustration, the deposits, we will say, of a bank with $100,000 capital would be ordinarily $1,000,000. If you collected the entire 10 per cent assessment, you only would collect 10 per cent of your deposits after all. . . . But in practice you would not

abandoned the assessment plan.[8] Courts should, of course, see that the congressional policy is not defeated by any fraud, by creating sham corporations, or by any other artifice. When, however, assessment liability is a failure only because the corporate owner of the stock is not solvent, that is not a circumstance which will warrant disregard of the corporate entity so as to render stockholders liable. The findings here, accepted by the Court, eliminate every charge of fraud, bad faith, or intentional evasion of liability.[9]

We are fully agreed that Bank of Kentucky depositors, however, should not be prejudiced by a transfer to the holding company of its stock in violation of letter or spirit

---

collect over 50 per cent of that. We do collect, as a matter of fact, just about 50 per cent." Hearings, *supra* note 4, Pt. 1, p. 28.

Depositors in the bank have already received 77 per cent of their deposits. Few pre-depression investments have yielded so much. About 6,000 stockholders of Banco have lost 100 per cent of their investment, and are now faced with liability in undetermined amounts. As to many of them, it is idle to say that they had actual responsibility for the Bank's management or any better knowledge of its affairs than the depositors.

[8] Within the last decade at least thirty-one states which formerly had double liability have abolished it either absolutely or upon compliance with certain conditions. Only five states appear to have retained their double liability provisions intact, and in one of these a proposal to abolish it is currently being considered. See "Stockholders' Double Liability," Commerce Clearing House State Banking Law Service, Vol. II.

[9] Findings of the trial court included the following:

"61. Banco was organized in good faith.

62. Banco was 'certainly not a sham.'

63. Banco was 'not organized for a fraudulent purpose or to conceal secret or sinister enterprises conducted for the benefit of the Bank.'

64. Banco was not a mere holding company.

65. Banco 'was formed for the purpose set out in the letter of July 19, 1929, and for no other purpose.'

66. Banco 'was not formed as a medium or agency through which to avoid double liability on the stock of the Bank.' "

of the National Banking Act. If the case warrants disregard of the transfer, the depositors then would have just the protection that they would have enjoyed had no holding company intervened. The Court, however, makes the holding company a windfall to bank creditors by extending the liability to persons never otherwise reachable. We may disallow the holding company as a sanctuary for stockholders escaping pre-existing liability without making of it a trap for unwary and unwarned investors.

To disregard the transfer of this stock, and to hold former stockholders liable to the same extent as if they had made no such transfer, is the manner of proceeding indicated under proper circumstances by the National Banking Act itself. Instead of considering whether to disregard the transfer the Court disregards the corporate entity of the holding company because it says these obligations arise from legislative policy. Even if we could find such a policy, legislative liabilities are numerous. It is probably a legislative policy that a corporation shall pay all of its debts. The reasoning employed by the Court, we should think, would leave it uncertain whether stockholders may not be liable for many other types of indebtedness. Congress, if the matter of banking reform were left to it, could define the limits of vicarious liability at the time it was imposed. The Court is leaving the limits and extent of that liability so vague that a whole cluster of decisions will have to be written to clarify what is being done today. And meanwhile we know of no way that a stockholder can learn the extent and circumstances of stockholder liability except to give his name to a leading case.[10]

The Court admits that the judgment is "harsh." Why is it so if it is according to any law that was known or

---

[10] This Court has considered the disregard of the corporate fiction in *Donnell* v. *Herring-Hall-Marvin Safe Co.*, 208 U. S. 267, 273 and *Klein* v. *Board of Supervisors*, 282 U. S. 19, 24.

knowable at the time of the transactions? To enforce a double liability so incurred would be no harsher than to enforce any contract obligation that had been assumed without expecting it would result in liability. This decision is made harsh by the element of surprise.[11] Its only harshness is that which comes of the Court's doing with backwards effect what Congress has not seen fit to do with forward effect.

---

[11] In authoritative studies made prior to the origin of this controversy which included studies of many of the cases cited by the Court's opinion we are unable to find a trace or suggestion of the present theory of stockholder liability for corporate obligations created by legislation. See Douglas and Shanks, Insulation from Liability through Subsidiary Corporations (1929), 39 Yale L. J. 193; Powell, Parent and Subsidiary Corporations (1931), esp. Ch. III; Wormser, Disregard of the Corporate Fiction (1927).