FEDERAL DEPOSIT INSURANCE CORPORATION, as Receiver of The Fort Greene National Bank in New York, Appellant, *v.* PHILIP APFELBAUM et al., Defendants, and JAMES H. HICKEY et al., Respondents.

Second Department, December 18, 1944.

*N. William Welling* and *Sidney R. Nussenfeld* for appellant.
*James H. Hickey* respondent in person.

*George A. Roland* for Howard Chardavoyne and another, as executors of Henry S. Chardavoyne, deceased, respondents.

JOHNSTON, J. After trial by the court without a jury the complaint was dismissed on the merits and plaintiff appeals. Whether this ruling was sound depends upon the interpretation and application of certain Federal statutes.

The action is by the receiver of an insolvent national banking corporation — The Fort Greene National Bank in New York — against two of its stockholders — James H. Hickey and Henry S. Chardavoyne — to enforce payment of their double liability to creditors. The statutory liability is created by Acts of Congress. (U. S. Code, tit. 12, §§ 63, 64, originally, U. S. Rev. Stat., § 5151, National Bank Act of June 3, 1864, ch. 106, § 12, 13 U. S. Stat. 102, Federal Reserve Act of December 23, 1913, ch. 6, § 23, 38 U. S. Stat. 273.) By these statutes shareholders of every national banking association are rendered individually liable for all contracts, debts and engagements of such association, to the extent of the amount of their stock therein, at the par value thereof, in addition to the amount invested in such shares. While the action was pending Henry S. Chardavoyne died and his executors have been substituted as defendants.

In 1929 or 1930, soon after the organization of the bank, Hickey and Chardavoyne (hereinafter called respondents) became shareholders and certificates of stock were issued to them. They held these certificates until 1935 and 1936, when they surrendered them and received in exchange therefor new certificates issued as a result of two reclassifications of the bank's stock effected in 1934.

The sole defense interposed was that as to stock issued after June 16, 1933, Congress, by an Act of that date (U. S. Code, tit. 12, § 64a), expressly removed the liability imposed by the earlier statutes. That Act provided that: " The additional liability imposed upon shareholders in national banking associations by the provisions of sections 63 and 64 of this title shall not apply with respect to shares in any such association issued after June 16, 1933."

By Act of August 23, 1935 (ch. 614, § 304, 49 U. S. Stat. 708) Congress amended section 64a so as to permit the holders of shares issued prior to June 16, 1933, to be relieved of liability on condition that the banking association give notice of the termination of such liability by advertising in designated newspapers for a period of six months. Concededly, in the case at bar such notice was not given.

Defendants contend that they are the owners of stock issued after June 16, 1933, and, consequently, section 64a relieves them from the liability imposed by sections 63 and 64. The primary question to be determined is whether, within the purview of section 64a, the stock in suit must be deemed to have been issued on the date it originally was purchased and the stock certificates issued, or on the dates the new stock certificates were issued as a result of the reclassifications of the bank's capital stock.

There is no dispute as to the essential facts.

In 1929 the bank was organized with a capital stock of $500,000, consisting of 5,000 shares of common stock of $100 par value. In the same or the following year the bank disposed of all its stock. It sold 35 shares to Hickey and 52 shares to Chardavoyne.

In June, 1934, the bank reclassified its stock by reducing the par value to $70, thereby reducing its common stock to $350,000, and by issuing 3,750 shares of preferred stock of $40 par value, or a total of $150,000 of preferred stock. This preferred stock was sold to the Reconstruction Finance Corporation after the stockholders had declined to exercise their pre-emptive right of purchase. The holders of such preferred stock obtained voting control and a preference with respect to payment of dividends and distribution of assets upon liquidation. New certificates, however, for the $70 par value common stock were not issued.

In October, 1934, the bank again reclassified its stock by eliminating the preferred stock, by increasing its common stock to 50,000 shares, and by further reducing the par value of its common stock to $10. Except for the change in the par value, the capital structure of the bank was the same as when it was organized, to wit, $500,000, consisting of common stock, with equal rights and privileges.

The bank then called in the old common stock certificates and, in substitution or exchange therefor, issued seven shares of its new $10 common stock for each share of its old $70 common stock. The additional 15,000 shares, with a par value of $150,000, resulting from the last reclassification, the bank sold for $12.50 a share, or a total of $187,500, and used the proceeds to retire the preferred stock. This additional common stock was sold to outsiders after the stockholders again had failed to exercise their pre-emptive right to purchase. To distinguish between the old and the new stockholders, the numbers on the new stock certificates given in exchange to the old stockholders were prefixed with the letter "A," while the numbers on the

stock certificates issued to the new stockholders were prefixed with the letter " B ;" that is, one had an " A " series of numbers and the other had a " B " series of numbers. The class " B" stock is not involved in this action.

Thereafter, in 1935 and 1936, defendants surrendered their old stock and received, respectively, in lieu thereof, certificates numbered " A " for 350 shares, and 520 shares of $10 par value common stock, such certificates being dated February 6 and 15, 1935, April 15, 1935, and November 24, 1936. It is upon the basis of these certificates, *for which no additional cash consideration was paid,* that this suit is brought.

The new certificates issued to respondents and the other old stockholders contain the following legend on the face thereof: " The shares of the Common Capital Stock of the Bank, represented by this certificate, are issued pursuant to the provisions of Section 5151, United States Revised Statutes, as amended, and Section 23 of the Federal Reserve Act, as amended." Section 5151 of the Revised Statutes is the predecessor of the present sections 63 and 64 of title 12 of the United States Code, which impose the double liability on the stockholders. Whether this legend was on the certificates issued to the new stockholders does not appear from this record. However, in the notice which the bank, on October 11, 1934, sent to the old stockholders, informing them of their right to subscribe to the additional common stock which became available after the last reclassification, it is stated: " The $150,000 additional common stock (15,000 shares at $10.00 par value per share) proposed to be issued are free from the additional liability imposed upon shareholders of the old common stock of your association, in that the additional liability imposed upon shareholders of national banking associations by the provisions of Section 5151, United States Revised Statutes, as amended, and Section 23 of the Federal Reserve Act, as amended, shall not apply with respect to the shares of common stock of this association, represented by the additional 15,000 shares of common stock at $10.00 par value per share, such stock having been issued subsequent to June 16, 1933."

Upon this state of facts can it be said that within the purview of section 64a of title 12 of the United States Code, the stock upon which this suit is founded was issued after June 16, 1933? I think not.

Considering all the statutes (U. S. Code, tit. 12, §§ 63, 64 and 64a) and bearing in mind the purpose underlying their enactment, I believe the date of issue of the stock in suit must be

deemed to be the date when the cash consideration therefor originally was paid. The date did not change, despite the subsequent changes in the bank's capital structure, through the medium of reclassifications heretofore described. Each such change did not convert into a new stock issue stock already sold. The legal relationship between the corporation and the stockholder was created when the corporation sold its stock. That was the time when the stock was issued.

The double liability imposed by the statutes (U. S. Code, tit. 12, §§ 63, 64) upon stockholders of national banking associations " attaches and exists for the purpose of creating a fund for the exclusive purpose of paying the creditors of the bank equably and ratably." (*Page* v. *Jones,* 7 F. 2d 541, 544.) It has no relation to the transactions of the bank and its stockholders concerning the bank stock. It is not the result of a contract between the corporation and its stockholders. It is created by statute, not in favor of the corporation but its creditors. Hence, it is a liability " which cannot be affected, discharged, or released by any action taken by the corporation, or by the combined action or agreement of the corporation and its stockholders." Once called into being by the act of one assuming the position of stockholder it " cannot be defeated save by the creditors, or by some one acting in their behalf." This follows by reason of the fact that the " law presumes that the creditors of a [national bank] corporation become, and continue to remain, such, in reliance upon the liability imposed upon the stockholders by statute; * * * ." (*Scott* v. *Latimer,* 89 F. 843, 852, 855; see, also, *Scott* v. *Deweese,* 181 U. S. 202, 213.)

In a recent case (*Anderson* v. *Abbott,* 321 U. S. 349, 362–365) the Supreme Court held that bank stockholders may not avoid their statutory liability by organizing a holding company to which they subsequently transfer their stock. The Supreme Court also indicated that the courts should be alert to prevent the frustration or circumvention of the long-standing legislative policy of double liability through the utilization of any financial scheme or device.

In the light of this well-established policy of double liability for the exclusive benefit of creditors, what was the purpose of Congress in providing by section 64a, first, that such liability shall not be imposed with respect to shares issued after June 16, 1933, and then in amending that section to permit such additional liability to be canceled with respect to all shares as of a date six months subsequent to prescribed advertising? Taking, as

we must, judicial notice of the chaotic banking condition existing in 1933 and the year preceding, the purpose appears to be clear: to repeal the double liability as to shares sold and issued after June 16, 1933, but to leave intact the existing stockholders' liability with respect to all shares sold and issued prior to that date. As to the latter class of shares, the intention was to permit cancelation of the liability only by advertising for six months that the stockholders were to be granted immunity from the " additional liability." Thus the depositors — who in contemplation of law relied on the " additional liability " — were warned that they were free to withdraw their deposits. Obviously reclassification was not a mode created by statute for granting immunity.

The enactment of section 64a was one of the means by which Congress endeavored to stabilize the banking business. Congress sought to attract new capital by exempting new investors from the " additional liability." The legislative purpose would not be promoted — it probably would be thwarted — if the liability of the old stockholders had been annulled or altered without regard to the rights of the bank's depositors and other creditors.

To permit a bank to cancel its stockholders' liability through the medium of a reshuffling or reclassification of its stock plainly would be to sanction a method not authorized by Congress and would leave the existing depositors no protection whatever. It smacks of a financial device for the discharge of the stockholders' statutory liability such as fell within the condemnation of the court in the *Anderson* case (321 U. S. 349, *supra*).

If we view the facts here realistically, it is apparent that reclassification of the stock in no way changed the date of its issue. A stock certificate is merely the tangible evidence of the proportionate interest which the investor has in the " stock " or assets of the bank. He becomes " a stockholder " the moment he pays and the bank receives his money for the stock. The actual issuance of the certificate is a mere formality which may be postponed or even never performed. (*Pacific National Bank* v. *Eaton,* 141 U. S. 227, 233–234.) The changes in the capital structure through the reclassifications did not increase or decrease the pro rata share of any investor in the stock or assets of the bank, even though the par value of his stock and the number of shares he held were changed. Thus, in June, 1934, when the $100 par value stock was reduced to $70, each stockholder still retained the same proportionate interest in the stock or assets of the bank. Similarly, in October, 1934, when the number of shares of common stock was increased to 50,000,

and the par value reduced to $10, each stockholder still held the same proportionate interest in the stock or assets of the bank. The fact that by the first reclassification preferred stock was issued did not change the interest of the common stockholders, for the bank actually received additional cash equal to the full par value of the preferred stock.

The conclusion here reached finds support in another independent statute (U. S. Code, tit. 12, § 52). This provides that every person becoming a shareholder in a national banking association by the transfer of shares shall " succeed to all rights and liabilities of the prior holder of such shares," and that " no change shall be made in the articles of association by which the rights, remedies or security of the existing creditors of the association shall be impaired." To hold that the date of issue of the original stock certificates was changed by the subsequent reclassifications and the issuance of new certificates would be tantamount to holding, contrary to the express command of this statute, that the holder of the new certificates does not become subject to the liabilities of the prior holder and that a change in the bank's articles of association may be made even though such change impairs the rights of existing creditors of the bank.

In support of their position respondents cite *Federal Deposit Ins. Corporation* v. *Gunderson* (106 F. 2d 633). That case may be readily distinguished. There, after a reclassification of stock in 1935, the bank became insolvent. The receiver thereupon sought to enforce against certain stockholders the statutory double liability. They defended, contending that section 64a had absolved them from liability because the reclassified stock was issued after June 16, 1933. While the court sustained the defense, it did so only on the ground that the old stockholders had surrendered their stock and, like every new stockholder, had paid a new and full cash consideration for the new stock issued in 1935. In other words, the new stock, after the reclassification, was not, as in the case at bar, issued in exchange or in substitution for the old stock but for the full cash consideration equal to the par value of the new stock.

Respondents also cite *Public Service Comm.* v. *N. Y. & Richmond Gas Co.* (244 App. Div. 398 [Third Department]) as authority for the proposition that a reclassification of stock constitutes an issue of stock. While that case so holds, it has no application to the facts in the case at bar. There the question involved was whether section 69 of the Public Service Law required the consent of the Public Service Commission to the issue of stock only when the money was to be used for certain specified pur-

poses. The trial court so held. The Appellate Division reversed and held that consent was required when the utility corporation issues stock for any purpose; that such consent was required in order to protect the investing public; and, consequently, that a reclassification of stock which permitted the sale of additional stock to the public was an issue of stock to which the Commission's consent was required under the statute. That case can have no bearing here.

The judgment should be reversed on the law and the facts, without costs, and judgment, as prayed for in the supplemental complaint, should be directed for plaintiff, but without costs.

HAGARTY, Acting P. J., CARSWELL, LEWIS and ALDRICH, JJ., concur.

Judgment reversed on the law and the facts, without costs, and judgment, as prayed for in the supplemental complaint, directed in favor of the plaintiff, but without costs.